**George G. BLESSITT and Willie Neal, Jr., Plaintiffs-Appellants,**

v.

**RETIREMENT PLAN FOR EMPLOY-EES OF DIXIE ENGINE CO., et al., Defendants-Appellees.**

No. 86–8123.

United States Court of Appeals, Eleventh Circuit.

July 8, 1988.

James S. Altman, Richard D. Ellenberg, P.C., Atlanta, Ga., for plaintiffs-appellants.

David M. Leonard, Hugh C. Griffin, Atlanta, Ga., Larry A. Hansen, Carol B. Kiersky, Chicago, Ill., for defendants-appellees.

Hugh C. Griffin, Lord, Bissell, & Brook, Chicago, Ill., for Retirement Plan.

Harry V. Lamon, Jr., Kenneth R. Russell, Jr., Martha McGhee Glisson, Atlanta, Ga., for amicus curiae American Society of Pension Actuaries.

Gary M. Ford, Office of Gen. Counsel, Pension Ben. Guar., Edward Thomas Veal, Jeanne K. Beck, Washington, D.C., for amicus curiae Pension Ben. Guar. Corp.

Christopher Mackaronis, American Assn. of Retired Persons, Steven S. Zaleznick, Cathy Verbtrell-Monsees, Washington, D.C., Norman Stein, University of Alabama, School of Law, Tuscaloosa, Ala., for amicus curiae American Ass'n of Retired Persons.

Steven J. Sacher, John Will Ongman, Evan Miller, Pepper, Hamilton & Scheetz, Washington, D.C., for amicus curiae Ass'n of Private Pension & Welfare Plans.

William L. Sollee, Daniel B. Stone, Laurie E. Keenan, Kurt L.P. Lawson, Washington, D.C., for amicus The Nat. Employee Benefits Institute.

Robin S. Conrad, Nat. Chamber Litigation Center, Inc., Washington, D.C., for amicus curiae Chamber of Commerce.

Karen W. Ferguson, Pension Rights Center, Washington, D.C., for amicus curiae Pension Rights Center.

Before RONEY, Chief Judge, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HATCHETT, ANDERSON, CLARK, and EDMONDSON, Circuit Judges.[*]

ANDERSON, Circuit Judge:

The narrow but important issue in this case is whether, when a defined benefit

---

[*] Honorable Emmett R. Cox did not take part in the consideration or decision of this case.

plan terminates, the Employee Retirement Income Security Act ("ERISA") requires that a defined benefit plan pay an employee the full, unreduced pension benefit the employee would have received had he continued to work until normal retirement age. We conclude that when a plan terminates, ERISA does not require that employees receive the normal retirement benefit they would have received had they continued to work to normal retirement age. In other words, ERISA does not require that employees receive a benefit which is calculated on the basis of anticipated future years of service which have not actually been worked as of the termination date. As applied to this case, the employees were entitled to receive upon plan termination only the benefit provided for under the plan—i.e. a benefit calculated on the basis of their actual years of service as of the termination date.

## I. BACKGROUND

Appellants George Blessitt and Willie Neal Jr. represent the class of Dixie Engine Co. employees who were participants in appellee Dixie Engine's defined benefit pension plan ("plan") and who were entitled to receive benefits when the plan terminated.[1] The plan was established in 1972 and was terminated on December 31, 1982, pursuant to the sale of substantially all of Dixie Engine's assets. Blessitt was

hired prior to the establishment of the plan and was continuously employed by Dixie Engine throughout the eleven year period in which the plan was in effect. On the termination date, Blessitt was 46 years old.

Blessitt elected to receive his benefits in the form of a present lump-sum distribution rather than as an annuity commencing at normal retirement age.[2] Dixie Engine calculated his benefits in accordance with the terms of the plan. After its asset distribution plan received the approval of the Pension Benefit Guaranty Corporation ("PBGC"), Dixie Engine paid out each employee's lump-sum distribution in late 1983. Approximately forty-six percent of the plan assets ($225,000) remained as surplus following satisfaction of all the plan liabilities, including the distributions to the employees. This amount reverted to Dixie Engine in accordance with Article XI Paragraph 11 of the plan.[3]

In August 1984, appellants commenced a class action suit against Dixie Engine, alleging *inter alia* that Dixie Engine used the wrong formula to calculate benefits and that therefore some of the benefits promised to the appellants under the plan had reverted to Dixie Engine, in violation of ERISA.[4] The district court granted summary judgment for Dixie Engine on this claim and this appeal followed. The

1. In this opinion we refer to appellants collectively as "Blessitt." The issue presented on appeal and our holding involves a single principle of law and there is no suggestion that its application will vary as among class members. For convenience, the opinion will deal with the individual facts of George Blessitt.

2. When a defined benefit plan terminates, normally an employee receives the benefits to which he is entitled in the form of an annuity commencing payments at normal retirement age. However, the employee can elect to receive a present lump-sum distribution, the value of which equals the amount of the annuity he otherwise would have received, actuarially reduced to present value. *See* 29 C.F.R. § 2617.4.

3. Article XI Paragraph 11, as amended by Paragraph XIII of Amendment III of the plan, provides that "[a]ny assets of this Plan which remain after provision has been made to satisfy all liabilities of this Plan shall, unless in contravention of any provision of law, be deemed to

have become available as a result of actuarial error and shall be distributed to the Employer in cash."

4. The appellants also claimed that Dixie Engine used an improper method to get the employees to select the form of their benefits and that even under Dixie Engine's calculations, Blessitt's benefits were $592.85 too low. In addition to the increased benefits, appellants sought attorney's fees, claiming that Dixie Engine acted in bad faith.

Upon cross motions for summary judgment, the district court concluded that Dixie Engine had used the wrong benefit form selection method and that Blessitt's benefits were $592.85 too low. Dixie Engine does not contest these rulings. The court also refused to award attorney's fees and Blessitt appeals this decision. In light of our conclusion that Blessitt is not entitled to additional benefits and in the absence of any evidence of bad faith by Dixie Engine, we affirm the district court's refusal to award attorney's fees to appellants.

panel reversed. 817 F.2d 1528 (11th Cir. 1987). A petition for rehearing in banc was granted, thus vacating the panel opinion. 836 F.2d 1571 (11th Cir.1988). We now affirm the district court.

## II. DISCUSSION

### A. DISPUTED BENEFIT FORMULAS

At the root of this dispute is the question of which of the plan's two formulas for calculating benefits applies to employees who had not reached normal retirement age at the termination date. The relevant provisions of the plan are set out below:

### ARTICLE V

*Accrued Benefits and
Retirement Benefits*

1. Accrued Benefit
[FORMULA 1]

The Monthly Accrued Benefit as of any date of determination *on or subsequent to a Participant's Normal Retirement Date* [5] shall be an amount equal to:

(a) 15% of the first $650 of a Participant's Average Monthly Earnings at such date of determination plus 20% of such earnings in excess of $650, multiplied by

(b) a fraction, not to exceed 1, the numerator of which is the total number of years of Credited Service [6] completed by a Participant and the denominator of which shall be twenty (20).

**5.** Article IV of the plan defines "Normal Retirement Date" as the later of the participant's 65th birthday or the date on which the participant completes ten years of service with Dixie Engine.

**6.** Under Article II of the plan, an employee gains a year of credited service for each twelve month period in which he completes at least 1000 hours of work. When the plan terminated, Blessitt had eleven (11) years of credited ser-

[FORMULA 2]

The Monthly Accrued Benefit *as of any determination date prior to a Participant's Normal Retirement Date* shall be equal to:

(a) the amount of the Participant's Monthly Accrued Benefit which would have become payable at his Normal Retirement Date had he continued in the employ of the Employer and had he continued to earn a monthly salary or wage in the same amount as his Average Monthly Earnings, multiplied by,

(b) a fraction, not to exceed 1, the numerator of which is the total years of Credited Service completed by the Participant as of the date of determination, and the denominator of which is the number of years of Credited Service he would have completed had he continued in employment to his Normal Retirement Date.

(emphasis supplied). Hereafter we refer to the two formulas as Formula 1 and Formula 2, respectively.

Blessitt contends that Formula 1 should have been applied as if he had worked until normal retirement age because this is the retirement benefit he expected to receive when he retired and that Dixie Engine therefore was entitled to a reversion of only those plan assets remaining after all benefits were calculated under his interpretation of Formula 1.[7] Dixie Engine applied Formula 2 to calculate the benefits of all employees who had not reached normal re-

vice. Since he was over 46 years of age at the time of plan termination, he would have worked approximately 18 additional years to reach the normal retirement age of 65. Had he worked until normal retirement age, he would have had twenty-nine (29) years of credited service.

**7.** Blessitt calculates his benefit under Formula 1 as follows:

% of Avg. Monthly Earnings x Formula 1 fraction
= % of Avg. Monthly Earnings x $\frac{\text{Credited Serv. at age 65}}{20}$
= % of Avg. Monthly Earnings x 29/20 (Formula 1 fraction)
= % of Avg. Monthly Earnings x 1 (under the plan, the Formula 1 fraction may not exceed 1)

Blessitt's calculation makes the numerator of the fraction 29, thus giving himself credit for the number of years he would have served if he had continued to work for Dixie Engine until he was 65. *See* note 6.

tirement age (65) on the termination date.[8] The parties agree that Blessitt is entitled *to* the Formula 2 amount; the disputed benefit amount is the difference between the Formula 2 amount and the amount Blessitt seeks. In monetary terms, the Formula 2 amount determined by Dixie Engine is approximately 38% of the amount Blessitt seeks.

In terms of legal significance, the difference between the two formulas as applied by the parties is that under Blessitt's application of Formula 1, he would receive credit for his anticipated future employment with Dixie Engine, which encompasses a period of approximately eighteen years. The issue before us is whether Blessitt has a legitimate, enforceable claim to benefits based on these eighteen years of anticipated future service which he did not actually work. Put another way, we must determine whether such benefits constitute plan liabilities that must be satisfied from plan assets prior to any reversion of residuary assets to the employer upon termination of a defined benefit plan funded entirely by employer contributions. As indicated in the analysis which follows, the statutes themselves, authoritative interpretations by the regulatory agencies, the caselaw, and policy considerations all point ineluctably to the conclusion that Blessitt's position is untenable.

B. STATUTES AND INTERPRETATIONS BY REGULATORY AGENCIES

Section 4044 of ERISA, 29 U.S.C. § 1344, contains detailed provisions applicable to the post-termination allocation and distribution of plan assets to plan participants. In addition, § 403(c) and § 4044(d) of ERISA, 29 U.S.C. § 1103(c) and § 1344(d), and § 401(a)(2) of the Internal Revenue Code, 26 U.S.C. § 401(a)(2), specifically allow surplus assets remaining after satisfaction of a plan's liabilities to revert to the employer or plan sponsor when a defined benefit plan terminates.[9] These provisions create exceptions to the general rule that plan assets must be held for the exclusive benefit of employees and may never inure to the benefit of the plan sponsor. We address in turn the ERISA allocation provisions, the ERISA and Internal Revenue Code exceptions to the exclusive benefit and non-inurement rules, and the pertinent regulations interpreting these statutes.

As a preliminary matter, we note that we owe great deference to the interpretations and regulations of the Pension Benefit Guaranty Corporation ("PBGC"), the Internal Revenue Service ("IRS") and the Department of Labor, which are the administrative agencies responsible for enforcing and interpreting ERISA. As the Supreme Court stated, "a court that tries to chart a true course to the Act's purpose embarks on a voyage without a compass when it disregards the agency's views." *Ford Motor Co. v. Milhollin,* 444 U.S. 555, 568, 100 S.Ct. 790, 798, 63 L.Ed.2d 22 (1980). The Supreme Court has consistently advised that courts must adhere to the "venerable principle that the construction of a statute by those charged with its execution should

---

**8.** Dixie Engine calculated Blessitt's benefit under Formula 2 as follows:

$$\text{Formula 1 benefit} \times \frac{\text{Credited Service at termination}}{\text{Credited Service if Blessitt had worked until age 65}}$$

$$= (\% \text{ of Avg. Monthly Earnings} \times 1) \times \underbrace{11/29}_{\text{(formula 2 fraction)}}$$

(see note 7)

---

**9.** The Treasury and the Internal Revenue Service contend that § 401(a)(2), rather than the ERISA provisions, provides the "substantive requirements as to what constitutes a liability" that must be met before assets can revert to the employer when a plan terminates. *See* Gen. Couns. Mem. 39,665 (Sept. 25, 1987). Because we conclude that neither the ERISA provisions nor § 401(a)(2) requires Dixie Engine to pay Blessitt benefits based upon his anticipated future years of service, we do not address this issue.

**1168**

be followed unless there are compelling indications that it is wrong...." *Red Lion Broadcasting Co., Inc. v. F.C.C.*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969). Furthermore, we only must determine whether the agency's interpretation is reasonable. In making this determination, we "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding ... [A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 n. 11 and 844, 104 S.Ct. 2778, 2782 n. 11 and 2782, 81 L.Ed.2d 694 (1984).[10] Finally, we must defer not only to the regulations promulgated by administrative agencies charged with the enforcement and interpretation of ERISA and the Internal Revenue Code but also, when a regulation can be interpreted in more than one plausible way, we must recognize and defer to the agencies' interpretation of the regulation. *Ford Motor Co.*, 444 U.S. at 560, 100 S.Ct. at 794 (where statute and regulations in consumer credit area were susceptible to divergent interpretations, the court deferred to opinion letters and consumer advice publications which set forth the interpretation of the regulation by the appropriate administrative agency); *Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 219, 101 S.Ct. 2266, 2274, 68 L.Ed.2d 783 (1981) ("absent some obvious repugnance to the statute, the [agencies'] regulation implementing this legislation should be accepted by the courts, as should the [agencies'] interpretation of its own regulation.").

### 1. *ERISA allocation provisions*

When a single-employer defined benefit plan is voluntarily terminated by the employer, plan assets must be distributed to plan participants in accordance with the sixtier allocation scheme set forth in ERISA § 4044, codified as 29 U.S.C. § 1344. The six priority categories range from Category 1, which has the narrowest scope and highest priority, to Category 6, which has the broadest scope and lowest priority. The scope of each category is as follows:

*Category 1:* The portion of an employee's accrued benefits derived from voluntary employee contributions.

*Category 2:* The portion of an employee's accrued benefits derived from mandatory employee contributions.

*Category 3:* Annuity benefits that were or could have been in "payout" status three years before the plan terminated. (i.e. benefits that retired workers were receiving or could have received had they chosen to retire within the three years immediately prior to the termination date).

*Category 4:* All other benefits guaranteed by the PBGC.

*Category 5:* "[A]ll other nonforfeitable benefits under the plan."

*Category 6:* "[A]ll other benefits under the plan."

29 U.S.C. § 1344(a). The employer/plan sponsor must satisfy all claims within a particular category before it distributes any assets to the next lower priority category. 29 C.F.R. § 2618.10(d). If the assets are insufficient to satisfy all the claims within a particular category, the assets are "distributed among the participants according to the ratio that the value of each participant's benefit or benefits in that priority category bears to the total

---

**10.** *See also Teamsters v. Daniel,* 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808 (1979) ("It is commonplace in our jurisprudence that an administrative agency's consistent, longstanding interpretation of the statute under which it operates is entitled to considerable weight."); *American Mutual Liability Insurance Co. v. Smith,* 766 F.2d 1513, 1519 (11th Cir.

1985); *Rettig v. PBGC,* 744 F.2d 133, 140–41 (D.C.Cir.1984) ("We are required to grant a considerable degree of deference to the PBGC's reconciliation of competing statutory policies."); *Concord Control, Inc. v. International Union,* 647 F.2d 701, 704 (6th Cir.), *cert. denied,* 454 U.S. 1054, 102 S.Ct. 599, 70 L.Ed.2d 590 (1981).

value of all benefits in that priority category." 29 C.F.R. § 2618.10(e). Any assets remaining after satisfaction of all liabilities in Categories 1–6 can revert to the employer if the plan specifically allows such a reversion and the distribution is not otherwise unlawful. 29 U.S.C. § 1344(d)(1).

Only Categories 4, 5, and 6 are relevant to this litigation.[11] Category 4 encompasses benefits guaranteed by the PBGC. The PBGC guarantees all benefits that are nonforfeitable (i.e. vested)[12] immediately prior to plan termination and that conform to certain other restrictions which are met in this case. *See* 29 U.S.C. § 1322 and 29 C.F.R. § 2613. The parties agree that all of Blessitt's benefits calculated under Formula 2 are "Category 4" benefits (i.e. guaranteed, vested benefits). The parties also agree that if Blessitt is entitled to any Formula 1 benefits based on future years of service, these benefits must fall within the scope of Categories 5 or 6.

The plain language of Categories 5 and 6 clearly specifies that these sections extend only to benefits *under the plan.* Category 5 covers "all other nonforfeitable benefits under the plan." 29 U.S.C. § 1344(a)(5). Category 6 covers "all other benefits under the plan." 29 U.S.C. § 1344(a)(6). The benefit provisions of the Dixie Engine plan are detailed and comprehensive; no part of the plan directly or indirectly creates or describes benefits based on anticipated future years of service. The only benefits provided by the Dixie Engine plan are the accrued benefits calculated under the two formulas set out above. The applicability of each formula is clear: Formula 1 calculates "[t]he Monthly Accrued Benefit as of any date of determination [plan termination] *on or subsequent to a Participant's Normal Retirement Date*"; Formula 2 calculates "[t]he Monthly Accrued Benefit as of any determination date *prior to a Participant's Normal Retirement Date.*" Article V Paragraph 1 (emphasis supplied).[13] Attainment of normal retirement age (65) is the plan's unambiguous prerequisite for qualifying for Formula 1 benefits. For employees such as Blessitt who had not reached normal retirement age when the plan terminated, the only benefits available or promised *under the plan* are the Formula 2 benefits. Consequently, to award Blessitt benefits based on his anticipated future years of service would exceed the unambiguous terms of the plan and therefore would contradict the plain language of the Section 1344 allocation provisions of ERISA.

### 2. *ERISA and Internal Revenue Code Exceptions to the Exclusive Benefit and Non-Inurement Rules*

In general, an employer who sponsors and funds an employee benefit plan must hold, use, and distribute the plan assets for the exclusive benefit of the employees who participate in the plan. 26 U.S.C. § 401(a)(2); 29 U.S.C. § 1103(c).[14] ERISA

---

11. Because the plan neither required nor permitted employee contributions, Categories 1 and 2 are inapplicable. None of the members of the plaintiff class were within three years of their normal retirement date, thus Category 3 is inapplicable.

12. We use the terms "nonforfeitable" and "vested" interchangeably, as did Congress in drafting ERISA. *Nachman Corp. v. PBGC,* 446 U.S. 359, 377, 100 S.Ct. 1723, 1734, 64 L.Ed.2d 354 (1980) ("the terms 'vested' and 'nonforfeitable' were used synonymously" throughout the entire legislative history of ERISA). The Supreme Court explains that a benefit is vested if "the employee's right to the benefit would survive termination of his employment"—or, in this case, the termination of the plan. *Id.* at 364–65, 100 S.Ct. at 1727. *See also Hoover v. Cumberland, Md. Area Teamsters Pension Fund,* 756 F.2d 977, 983 n. 14 (3d Cir.), *cert. denied,* 474 U.S. 845, 106 S.Ct. 135, 88 L.Ed.2d 111 (1985).

13. Furthermore, Article XIII Paragraph 1 of the plan states that "[i]nclusion in this Plan shall not ... give the Participant any right, claim or interest in any Retirement Benefits herein described *except upon fulfillment of the provisions and requirements of this Plan.*" (emphasis supplied).

14. Section 401(a)(2) provides, in relevant part, that a pension benefit trust qualifies under ERISA (and thereby receives tax-favored status) if "it is impossible, *at any time prior to the satisfaction of all liabilities with respect to employees* and their beneficiaries under the trust, for any part of the corpus or income to be ... used for, or diverted to, purposes other than for the exclusive benefit of his employees...." 26 U.S.C. § 401(a)(2) (emphasis supplied).

Section 403(c)(1) of ERISA provides that "[e]xcept as provided ... under sections 1342 and 1344 of this title (relating to termination of

also requires that "the assets of a plan shall never inure to the benefit of any employer...." 29 U.S.C. § 1103(c)(1). Both the exclusive benefit and non-inurement rules must be satisfied in order for the pension plan to gain tax-favored status. Under certain circumstances specified in the statute, however, neither the exclusive benefit nor the non-inurement rule is violated if excess plan assets revert to the plan sponsor when a defined benefit plan is terminated.

Under § 401(a)(2), if the employer satisfies all plan liabilities, it can recover any surplus assets that remain without violating the exclusive benefit rule. Treasury Regulation § 1.401–2(b)(1)[15] explains the meaning of "liabilities" under Section 401(a)(2) as follows:

> (1) The intent and purpose in section 401(a)(2) of the phrase 'prior to the satisfaction of all liabilities with respect to employees ...' is to permit the employer to reserve the right to recover at the termination of the trust ... any balance remaining in the trust which is due to erroneous actuarial computations during the previous life of the trust. A balance due to an 'erroneous actuarial computation' is the surplus arising because actual requirements differ from the expected requirements....

> For example, a trust has accumulated assets of $1,000,000 at the time of liquidation, determined by acceptable actuarial procedures ... as being necessary to provide the benefits in accordance with the provisions of the plan. Upon such liquidation it is found that $950,000 will satisfy all of the liabilities *under the plan.* The surplus of $50,000 arises, *therefore,* because of the difference between the amounts actuarially determined and the amounts actually required to satisfy the liabilities. This $50,000, therefore, is the amount which may be

returned to the employer as the result of an erroneous actuarial error.

26 C.F.R. § 1.401–2(b)(1) (emphasis supplied). From the example given in the regulation, it is clear that any plan assets remaining after the satisfaction of all liabilities *under the plan* are defined to be the result of actuarial error and therefore a reversion of these assets to the employer does not violate the exclusive benefit rule.

The plan's reversion provision mirrors the regulatory interpretation of § 401(a)(2). Paragraph 11 of Article XI, as amended, states that any assets remaining after the plan's liabilities are met "shall ... be deemed to have become available as a result of actuarial error and shall be distributed to the Employer in cash."

Treasury Regulation § 1.401–2(b)(2) requires that the plan's fixed and contingent liabilities to employees both must be satisfied before any reversion can occur. Fixed liabilities are benefits that are vested when the plan terminates; contingent liabilities are benefits that are accrued but not yet vested when the plan terminates. These definitions have been consistently applied by the Internal Revenue Service and Treasury for more than thirty-five years. For example, in Revenue Ruling 85–6, 1985–1 C.B. 133, the Internal Revenue Service explained that "section 1.401–2(b)(2) provides that the liabilities that must be satisfied include both fixed (those nonforfeitable prior to termination) and contingent (those not nonforfeitable prior to termination) liabilities. After satisfaction of those liabilities, an employer may recover any remaining funds from the plan as surplus resulting from actuarial error."[16]

Contingent liabilities have never been interpreted to include benefits that had not yet accrued when a plan terminated. In I.R.S. Publication 778, the Service reiterated its longstanding position that "fixed liabilities are the amounts required to pro-

---

**15.** Treas. Reg. § 1.401–2 predates ERISA. However, it is applied to post-ERISA plans under Treas. Reg. § 1.401(a)–2.

**16.** *See* Rev.Rul. 86–48, 1986–1 C.B. 214 (both vested and nonvested benefits must be satisfied prior to any reversion).

insured plans), the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan...." 29 U.S.C. § 1103(c)(1).

vide the benefits payable to those who have become entitled to them. Contingent liabilities are the benefit credits accrued up to the time of termination of the trust for employees (and their beneficiaries) who might have become entitled to benefits if the trust had been continued indefinitely." I.R.S. Pub. No. 778, Part 3(d) (February 1972).[17] In short, well established regulatory interpretation is inconsistent with Blessitt's argument that the law requires a plan to pay unaccrued benefits upon termination based upon future years of service not actually worked. As discussed above, we owe great deference to regulations promulgated by administrative agencies charged with enforcing a statute.

The reversion Dixie Engine seeks conforms with § 401(a)(2) and the Treasury Regulations and Revenue Rulings interpreting it. As noted above, the reversion provision of the plan is fully synchronized with the regulatory interpretation of § 401(a)(2). Moreover, Dixie Engine satisfied all the plan's fixed and contingent liabilities when it paid participants all the benefits they had accrued *under the plan* as of the termination date, including those benefits that had not yet vested. Nothing in the plan requires unaccrued benefit expectancies (i.e. benefits based on future years of service not actually worked) to be paid prior to reversion of surplus assets to the employer. Section 401(a)(2) requires nothing more.[18]

The corresponding provisions of ERISA are in accord with the foregoing Internal Revenue Code provisions. The ERISA exclusive benefit and non-inurement rules provide an explicit exception for reversions that occur in accordance with the 29 U.S.C. § 1344 allocation provisions. Section 4044(d) of ERISA, 29 U.S.C. § 1344(d), al-

lows residual assets to revert to the employer if all the liabilities of the plan are met, the distribution does not otherwise violate the law, and the plan provides for such a distribution. Blessitt contends only that Dixie Engine did not satisfy all the plan liabilities. Residual assets are defined by the PBGC regulations as "the plan assets remaining after all liabilities of the plan to participants and their beneficiaries for benefits through priority category 6 have been satisfied." 29 C.F.R. § 2618.2. As discussed above, the benefits Blessitt seeks are not among those required to be allocated under the six priority categories and distributed to employees because these benefits are not benefits *under the plan.* The assets necessary to satisfy these benefits therefore are residual assets which may revert to the employer in accordance with the recognized statutory exception to ERISA's exclusive benefit and non-inurement rules.

In addition to the administrative interpretations of the specific statutes and regulations discussed above, there are other relevant administrative interpretations which we must consider. The three agencies charged with administering ERISA—the PBGC, the IRS, and the Department of Labor—all concur that benefit accrual ceases when a plan terminates. Blessitt's argument that he is entitled to benefits he expects to accrue through his anticipated future years of service directly conflicts with these administrative interpretations to which we owe deference.

a. Joint Implementation Guidelines for Termination of Defined Benefit Plans.

In May 1984, the Treasury, the PBGC, and the Department of Labor issued joint

---

17. I.R.S. Publication 778 reiterated verbatim the rules expressed in the following Revenue Rulings: Rev. Rul. 69–421, 1969–1 C.B. 59, 69; Rev. Rul. 65–178, 1965–2 C.B. 94, 110; Rev. Rul. 61–157, 1961–2 C.B. 67, 79; Rev. Rul. 57–163, 1957–1 C.B. 128, 138; Rev. Rul. 33, 1953–1 C.B. 267, 273. *See also* Rev. Rul. 80–229, 1980–2 C.B. 133, 134 (in the context of prescribing rules for determining whether an asset distribution plan violates the § 401(a)(4) nondiscrimination provisions, the ruling states that "[i]f the assets as of the date of termination exceed the present value of the accrued benefits

(whether or not nonforfeitable) as of such date, the plan will not be considered discriminatory if such excess reverts to the employer....")

18. *See also* Gen.Couns.Mem. 39,665 (September 25, 1987), which was issued in response to a request for the Treasury's interpretation of the now vacated panel opinion in this case. The Memorandum concluded that requiring an employer to pay the type of benefits Blessitt seeks before it can claim the residuary assets is inconsistent with § 401(a)(2).

administrative guidelines applicable to the termination of defined benefit plans involving reversions of excess assets to the plan sponsor. PBGC News Release 84–23 (May 23, 1984), *reprinted at* 11 Pens.Rep. (BNA) 724 (May 28, 1984). Paragraph one of the guidelines provides that "when an employer terminates a defined benefit pension plan, it may not recover any surplus assets until it has fully vested all participants' benefits and has purchased and distributed annuity contracts to protect participants against the risk that their *accrued* benefits may be jeopardized by future market fluctuations or other factors." (emphasis supplied). It is clear from this portion of the guidelines that an employer must satisfy only the employees' *accrued* benefits under the plan—not benefits that would accrue in the future if the employees continued to work for the employer after the plan terminates—before a reversion of the residual assets is permitted.

### b. PBGC

The PBGC consistently has construed Category 6 to include only benefits actually accrued as of the termination date according to the terms of the plan.[19] Blessitt's assertion that Category 6 includes unaccrued benefits based on future years of service not actually worked is inconsistent with the PBGC's longstanding position.

Numerous PBGC Opinion Letters reiterate the PBGC's longstanding position that accrual of benefits for purposes of ERISA ceases when a plan terminates. For example, in PBGC Opinion Letter 86–5 (March 6, 1986), the PBGC advised a plan sponsor that "ERISA does not apply to assets remaining after the satisfaction ... of all accrued benefits under a pension plan

that has not provided for employee contributions. Hence a transfer of such assets to a separate trust to await further disposition would not. violate the provisions of Title IV [of ERISA]." Similarly, in PBGC Opinion Letter 86–1 (January 15, 1986), the PBGC gave the following advice:

> As a participant accrues more years of service, he or she generally accrues higher benefits which will be payable upon retirement. On the date of plan termination, however, all accruals will cease. Benefit entitlements under the terminated plan are calculated with reference *only* to each participant's service accrued up to the date of termination. For example, a participant with 15 years of service and 45 years of age on the date of plan termination will generally be entitled to a benefit calculated with reference to 15 years of service and payable at normal retirement age.

This interpretation directly contradicts Blessitt's position. *See also* PBGC Opinion Letters 85–28 (December 2, 1985) and 85–9 (April 5, 1985) (when a defined benefit plan terminates, residual assets in excess of the accrued benefits under the plan as of the termination date can revert to the employer).

### C. CASELAW

No case has ever held that, when a defined benefit plan terminates, an employer is required to pay an employee retirement benefits based on future years of service not yet worked. On the other hand, several cases hold that benefit accruals cease when a plan terminates. *See In Re Pension Plan for Employees of Broadway Maintenance*, 707 F.2d 647 (2d Cir.1983); *In Re Syntex Fabrics, Inc. v. Pension Plan*, 698 F.2d 199 (3d Cir.1983); *PBGC v.*

**19.** We note that we owe particularly great deference to PBGC interpretations of Title IV of ERISA, which encompasses the allocation and termination provisions addressed in this opinion. *See Belland v. PBGC*, 726 F.2d 839, 843 (D.C.Cir.1984) ("PBGC's interpretation of ERISA is entitled to great deference."); *U.S. Steelworkers of America v. Harris and Sons Steel Co.*, 706 F.2d 1289, 1296 (3d Cir.1983); *Connolly v. PBGC*, 581 F.2d 729, 730 (9th Cir.1978), *cert. denied*, 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 492 (1979) ("[T]he determination of the PBGC

... is entitled to great deference in the construction and application of ERISA"); *I.A.M. National Pension Fund v. Cooper Industries*, 635 F.Supp. 335, 339 (D.D.C.1986) (citing PBGC Opinion Letter as support for interpretation of ERISA statute).

As discussed above, we also owe great deference to the PBGC's interpretation of its own regulations. *See Ford Motor Co.*, 444 U.S. at 560, 100 S.Ct. at 794, and *Anderson Bros. Ford*, 452 U.S. at 219, 101 S.Ct. at 2273.

*Heppenstall,* 633 F.2d 293 (3d Cir.1980). The issue in these cases was how to determine the plan termination date when a plan was involuntarily terminated by the PBGC because of insufficient assets. The Courts concluded that the plan officially terminated when the employees received sufficient notice of the plan's involuntary termination because as of that date, the employees no longer had a justifiable expectation of continued benefit accrual. In other words, notice of plan termination meant that employees no longer could reasonably rely on their continued employment endowing them with further accrual of benefits.

This reasoning directly contradicts Blessitt's argument that when the plan terminated he had a reasonable expectation of receiving all retirement benefits he would have accrued through eighteen years of anticipated future employment with Dixie Engine subsequent to the plan's termination. It is clear under *Broadway Maintenance, Syntex,* and *Heppenstall* that all reasonable expectations of benefits accrual cease when the plan terminates, regardless of whether the participant continues to work for the plan sponsor. *See, e.g., Heppenstall,* 633 F.2d at 301–02 ("The termination date affects employees in quite a different way, by fixing the date beyond which, whether or not they continue to work, they no longer accrue additional vested pension rights. This, obviously, is an expectation or reliance interest." When

employees receive notice that the plan is terminated, "they no longer [have] a justifiable expectation in the accrual of vested pension rights.") The courts in all three cases specifically note that benefit accruals cease when the plan terminates. *Id.; Broadway Maintenance,* 707 F.2d at 649 ("[T]ermination marks the date on which the benefits of plan participants cease to accrue."); *Syntex Fabrics,* 698 F.2d at 201 (when a plan terminates, "employees are affected ... since they no longer accrue additional pension rights.")[20]

Blessitt relies on *Amato v. Western Union International, Inc.,* 773 F.2d 1402 (2d Cir.1985), *cert. denied,* 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986), and *Tilley v. Mead Corp.,* 815 F.2d 989 (4th Cir. 1987), which he claims awarded the type of benefits he seeks. Blessitt misreads these cases. Neither *Amato* nor *Tilley* awarded benefits based on an employee's expected future years of service.[21] In *Amato,* a Second Circuit panel held that the plaintiff could receive benefits calculated under an early retirement formula which had been removed by a plan amendment even though he had not reached the requisite age/years of service combination necessary to qualify for the full preamendment early retirement benefit. However, the benefit received was *not* calculated on the basis of years not yet worked.

Specifically, in *Amato* the early retirement formula at issue allowed workers

---

**20.** *See generally Chait v. Bernstein,* 835 F.2d 1017 (3d Cir.1988) ("[E]xpected benefits are calculable with mathematical certainty and did not include such surplus in the equation. Simply put, the employees only expected to receive the defined benefits promised to each individual under the Plan."); *Wilson v. Bluefield Supply Co.,* 819 F.2d 457, 458 (4th Cir.1987) (when plan terminates, employer entitled to reversion of residual assets that remain after it satisfies all accrued benefits); *Victor v. Home Savings of America,* 645 F.Supp. 1486, 1492 n. 2 (E.D.Mo. 1986) ("[E]xcess assets revert to the employer. However, assets are not considered in excess unless all benefits accrued as of the date of termination 'are all provided for by the purchase of annuity contracts....'," quoting the Joint Implementation Guidelines); *District 65, UAW v. Harper & Row Publishers, Inc.,* 576 F.Supp. 1468, 1478 (S.D.N.Y.1983) (The 29 U.S.C. § 1344 allocation requirements of ERISA al-

low an employer to recapture the surplus assets remaining after accrued benefits have been allocated); *Pollock v. Castrovinci,* 476 F.Supp. 606 (S.D.N.Y.1979), *aff'd without opinion,* 622 F.2d 575 (2d Cir.1980).

**21.** Both *Amato* and *Tilley* dealt with early retirement or retirement-subsidy type benefits, not with an employee's normal retirement benefit. The prerequisites for entitlement to early retirement benefits and normal pension benefits are discreet and distinguishable. *See Hoover v. Cumberland, Md. Area Teamsters Pension Fund,* 756 F.2d 977, 982–83 (3d Cir.), *cert. denied,* 474 U.S. 845, 106 S.Ct. 135, 88 L.Ed.2d 111 (1985) and *Sutton v. Weirton Steel Division of National Steel Corporation,* 724 F.2d 406, 410 (4th Cir. 1983), *cert. denied,* 467 U.S. 1205, 104 S.Ct. 2387, 81 L.Ed.2d 345 (1984) (distinguishing accrued normal retirement benefits from early retirement benefits).

whose age and years of service totalled 75 to receive full, unreduced pension benefits regardless of whether the employee had reached normal retirement age. The plaintiff had accrued an age/service combination of 70 when the plan was amended to eliminate the early retirement provision. The court concluded that the plaintiff had a reasonable expectation of receiving a pension benefit calculated under the pre-amendment early retirement formula.[22] The plaintiff was awarded 70/75 of the full value of the early retirement benefit. The 70/75 figure represented the ratio of the plaintiff's accrued years of service plus age when the plan terminated (i.e. 70) to the accrued years of service plus age he would have had when he qualified for the full early retirement benefit (i.e. 75). *Amato*, 773 F.2d at 1415. This ratio is conceptually indistinguishable from the Formula 2 fraction in this case. As with the 70/75 ratio in *Amato*, Blessitt's Formula 2 fraction is the ratio of his accrued years of service when the plan terminated (i.e. 11) to the accrued years of service he would have had if and when he qualified for the full normal retirement (Formula 1) benefit (i.e. 29). This 11/29 ratio reduces the full retirement pension Blessitt would have received at age 65, just as the 70/75 ratio reduced the full early retirement benefit the *Amato* plaintiff would have received when his years of service and age totalled 75.[23]

We note that the issue addressed by the *Amato* and *Tilley* courts—i.e. whether a plan amendment can eliminate an early retirement benefit for which employees had not yet fully qualified at the time of the amendment—was addressed by the 1984 amendments to § 411(d)(6) of the Internal Revenue Code and § 204(g) of ERISA, 29 U.S.C. § 1054(g).[24] Under these sections as amended, a plan amendment cannot eliminate a retirement-type subsidy "with respect to a participant who satisfies (either before or after the amendment) the preamendment conditions for the subsidy." 26 U.S.C. § 411(d)(6)(B); 29 U.S.C. § 1054(g)(2). The 1984 amendment allows an employee to apply post-amendment ser-

---

**22.** The "reasonable expectation" addressed by the *Amato* court is conceptually different from the "justifiable expectation" idea addressed in *Heppenstall, Broadway Maintenance,* and *Syntex Fabrics*. *Amato* concerns an employee's reliance on the continued viability of an early retirement provision. In contrast, *Heppenstall, Broadway Maintenance,* and *Syntex Fabrics* focus on whether an employee reasonably can expect to accrue benefits after a plan terminates. The conclusions reached by the courts in these cases are compatible: an employee is entitled to expect that early retirement provisions in a plan will not be deleted by amendment shortly before the employee qualifies. However, he can reasonably expect to receive benefits under those provisions only to the extent he earns them through actual—not anticipated—years of service. *Accord Chait v. Bernstein,* 835 F.2d 1017 (3d Cir.1988); *Van Orman v. American Insurance Co.,* 680 F.2d 301, 310 (3d Cir.1982) ("[W]e find it difficult to perceive how plaintiffs' expectations would be frustrated by the defendants' retention of the surplus [when the plan terminates] if nothing in the booklets and letters led them to expect that a surplus might arise.").

**23.** In *Tilley,* the parties stipulated that "[p]laintiffs had no right to continued accrual of benefits after Plan termination." 815 F.2d at 991. Five of the six plaintiffs who sought early retirement benefits in *Tilley* had fulfilled the 30 years of service requirement and lacked only a few years on the age requirement (reaching age 62) when the plan terminated. The court awarded these plaintiffs the full value of their early retirement benefit, actuarially reduced to reflect the fact that the plaintiffs were a few years shy of the age contingency.

The sixth plaintiff was two years away from meeting the years of service requirement for the early retirement benefits (i.e. he had worked 28 years). The court dealt separately with this plaintiff by requiring that his benefits be actuarily reduced from age 64, rather than from age 62 as with the other plaintiffs, thereby recognizing that because this plaintiff had not met the years of service requirement, he should receive a smaller benefit relative to the other plaintiffs. Although we believe that the manner in which the *Tilley* court reduced the sixth plaintiff's benefits to account for his failure to meet the years of service requirement is inferior to the method used in *Amato* and under the Dixie Engine plan (i.e. a ratio based on years of service), the important point is that the *Tilley* court recognized, albeit implicitly, that employees who had not accrued the requisite number of years of service should receive a smaller portion of their early retirement benefit than employees who had met the service requirement.

**24.** Although both *Amato* and *Tilley* were decided after the 1984 amendments, they dealt with plan amendment controversies which preceded the ERISA amendments. The 1984 amendments were not applied retroactively.

vice actually worked toward fulfilling the eligibility requirements for the pre-amendment early retirement benefit. Contrary to the results in *Amato* and *Tilley*, the employee does not automatically qualify for whatever portion he had "accrued" when the plan was amended (i.e. he would not automatically be eligible to receive 70/75 of the early retirement benefit). Under the amended § 411(d)(6) and its ERISA counterpart, the employees in *Amato* and *Tilley* could not receive any portion of their early retirement benefits unless and until they actually met the pre-amendment age and years of service requirements.

Of more direct relevance to the issue in this case is a portion of the legislative history of the § 411(d)(6) amendment which applies the amendment in the context of a plan termination. The Senate Report specifies that when a plan terminates, it "is not to be considered to have satisfied all of its liabilities to participants and beneficiaries until it has provided for the payment of contingent liabilities with respect to a participant who, after the date of the termination of a plan, meets the requirements for a subsidized benefit." S.Rep. No. 575, 98th Cong., 2d Sess. 31 (1984), *reprinted in* 1984 U.S.Code Cong. & Admin.News 2547, 2577. As the Senate Report makes clear, an employee only gets credit for the post-termination years of service he actually works, and these years of service are relevant only for the limited purpose of meeting the eligibility requirements for retirement subsidy benefits (which are different and distinct from the normal retirement benefits at issue in this case.) The Report states that "the bill makes it clear that the prohibition against reduction of a benefit subsidy ... applies to a participant *only if the participant meets the conditions imposed by the plan on the availability of the subsidy.*" S.Rep. No. 575 at 28, 1984 U.S.Code Cong. & Admin.News at 2574 (emphasis added).

The crucial significance for this case of the new § 411(d) and its legislative history is the fact that the statute is inherently inconsistent with Blessitt's position. If Blessitt's approach were actually the law, there would be no need to apply § 411(d)(6) to a plan termination situation because the employee would immediately be credited with the future years of service necessary to qualify for the benefit.[25]

## D. POLICY

Blessitt argues that Dixie Engine's use of Formula 2 violates the public policy behind ERISA by denying him his benefit expectations. This argument is without merit. While it is true that ERISA was enacted to ensure that employees receive their "anticipated retirement benefits", it is clear that the scope of legitimate benefit expectations addressed by ERISA extends only to those benefits that employees accrue through "significant years of service." 29 U.S.C. § 1001. Congress believed that an employee had a legitimate expectation of receiving those retirement benefits earned through long years of employment. The Supreme Court explains "that Con-

---

**25.** *See also* Gen.Couns.Mem. 39,665 (Sept. 25, 1987). The Memorandum explains that:

In the legislative history of 411(d)(6), it is clear that a participant's service with an employer actually continues for certain purposes after a plan's termination. The Senate Finance Report indicates that while years of service may continue to count toward benefit entitlement subsequent to a plan's termination, *they must be earned.* By continuing to earn service for purposes of benefit entitlement, the employee may satisfy the contingencies contained in the plan with respect to a benefit. However, the employee is only accumulating service for the purposes of obtaining the subsidized benefit to which he or she had a contingent right (by reason of section 411(d)(6)) as of the date of termination ...

*Service does not accumulate for purposes of accruing additional amounts of retirement benefit.* Were "benefit expectations" payable upon the termination of a plan, there would be no reason for section 411(d)(6) to protect the right to attain eligibility for a benefit after a plan's termination. Thus, there would be no difference between service for purposes of benefit entitlement and service for purposes of benefit accrual. However, the difference in these concepts was recognized by Congress. This recognized distinction in the type of service which is credited after plan termination is inherently inconsistent with a rule which would instantaneously credit a participant with all service to normal retirement date. (Emphasis supplied)

gress through ERISA wanted to ensure that 'if a worker has been promised a defined pension benefit upon retirement— *and if he has fulfilled whatever conditions are required to obtain a vested benefit*— ... he actually receives it.'" *Alessi v. Raybestos-Manhattan Inc.*, 451 U.S. 504, 510, 101 S.Ct. 1895, 1899, 68 L.Ed.2d 402 (1981), *quoting Nachman Corp. v. PBGC*, 446 U.S. 359, 361, 100 S.Ct. 1723, 1726, 64 L.Ed.2d 354 (1980) (emphasis added). *See also Reuther v. Trustees of Trucking Emp., Etc.*, 575 F.2d 1074, 1076–77 (3d Cir.1978), holding similarly.

To reach this goal, the ERISA legislation mandated equitable vesting schedules, adequate funding requirements, and created plan termination insurance, all to protect the employee's *earned* benefits. 29 U.S.C. § 1001(c) ("It is hereby further declared to be the policy of this chapter to protect ... the interests of participants in private pension plans ... by improving the equitable character and the soundness of such plans by requiring them to vest the accrued benefits of employees with significant periods of service, to meet minimum standards of funding, and by requiring plan termination insurance."). Rather than enabling employees to get "something for nothing"— i.e. to receive present benefits for anticipated future years of employment which have not actually been and may never be worked —which is the inescapable result of Blessitt's approach, the essential purpose of ERISA is to prevent employees from getting "nothing for something"—to prevent them from receiving fewer benefits than those they accrue through years of service.

In addition, Blessitt's approach would dilute the claims of unvested employees to their accrued benefits. The benefits of employees whose accrued benefits are not vested immediately prior to plan termination are Category 6 benefits.[26] Under the Dixie Engine plan, the affected group of employees would include all those who had worked for less than ten years when the plan terminated. As Blessitt admits, the kind of unaccrued benefits he seeks, i.e. benefits based on future years of service, would have to be Category 6 benefits. If the plan had insufficient assets to meet all the Category 6 claims, each claim would receive a pro-rata share of the assets. Under Blessitt's theory, the claims of unvested workers with accrued benefits—i.e. benefits based on the actual years of service— would fall into the same category (6) with the claims based on anticipated future years of service not actually worked. Thus the former claims based on actual service would have to compete with the latter claims. And, where plan assets were not sufficient to meet all Category 6 claims, the more legitimate claims based on actual service would be diluted by the more speculative claims based on future service not actually worked.

We find no merit in Blessitt's argument that allowing Dixie Engine to recover the $225,000 in residual assets would constitute a windfall contrary to public policy. An employer's right to recover residual assets remaining after plan liabilities are satisfied has been affirmed and reaffirmed by Congress for more than fifty years.[27] Most recently, in deliberations on the Omnibus Budget Reconciliation Act of 1987, the Senate Finance Committee rejected a proposal to disallow reversions to employers, explaining that "[i]t believed that the present law standards, as reflected in the Implementation Guidelines[28], and the present-law excise tax on reversions are appropriate rules for addressing the issue of employer access to excess plan assets." S.Rep. No. 63, 100th Cong., 1st Sess. 193 (1987). *See also* H.R.Conf.Rep. No. 495, 100th Cong., 2d Sess. 870–71 (1987), *reprinted in* 1988 U.S. Code Cong. & Admin. News 2313–1245, 2313–1616, 2313–1617. The effect of Blessitt's position would

---

**26.** *See* discussion *infra* at Section III.

**27.** *See* Stein, *Raiders of the Corporate Pension Plan: The Reversion of Excess Plan Assets to the Employer,* 5 Am.J. Tax Policy 117 (1986); Pilant and Tilton, *The Pension Reversion Controversy and the Buck Letter: Another Round,* Tax Notes

(March 18, 1985); Amicus Curiae Brief of Association of Private Pension and Welfare Plans at 8–19.

**28.** *See* discussion of the Implementation Guidelines, *supra* at Section II.B.2.a.

be to eliminate for all practical purposes all reversions to employers.

Allowing employers to recover plan assets only after meeting the benefit expectancies such as those Blessitt claims would tend to encourage employers to minimally fund plans, thereby increasing the possibility that plan assets would be insufficient to meet even guaranteed benefits.

Finally, in a defined benefit plan in which all contributions are made by the employer, the employer bears the investment risk that the plan assets will be insufficient to meet benefit requirements when employees become eligible to receive pensions. It is not inequitable to permit employers to receive the benefit of the upside investment risk.[29]

### III. BLESSITT'S CONTENTIONS

Blessitt contends that because I.R.C. § 411(d)(3) requires that all accrued benefits become nonforfeitable upon plan termination, Category 5 ("all other nonforfeitable benefits under the plan") necessarily includes all accrued benefits other than those guaranteed by the PBGC. Thus, if all accrued benefits are encompassed by Category 5, Blessitt concludes that Category 6 necessarily must encompass the type of benefits contested here, which clearly are not accrued benefits. Blessitt also contends that the legislative history of § 1344 supports his interpretation. We reject both of these arguments.

Blessitt's argument that all accrued benefits are covered under Category 5 directly conflicts with the PBGC regulations to which we must defer. When a plan terminates, all accrued benefits as of the termination date become nonforfeitable to the extent they are funded. 26 U.S.C. § 411(d)(3)(A). For the purpose of *allocating* plan assets in accordance with § 1344, however, benefits that become nonforfeitable solely because of plan termination are treated as forfeitable benefits. 29 C.F.R. § 2618.2 ("For purposes of this part [allocation provisions], . . . [b]enefits that become nonforfeitable solely as a result of the termination of a plan will be considered forfeitable."). The effect of this regulation is that all accrued benefits not vested when the plan terminates fall within Category 6. Thus, contrary to Blessitt's position, Category 5 does not encompass all accrued benefits simply because those benefits become nonforfeitable when the plan terminates. Category 5's scope is limited to benefits that were nonforfeitable *before* the plan terminated but which were not guaranteed by the PBGC.[30] *Victor v. Home Savings of America,* 645 F.Supp. 1486, 1491 (E.D. Mo.1986) (Category 5 encompasses "[b]enefits that are vested (other than by reason of plan termination)"). For example, when a plan terminates, an employee might have accrued benefits which previously had vested in accordance with the terms of the plan but which exceeded the amount guaranteed by the PBGC. The amount of the vested benefit in excess of the PBGC limit would be a Category 5 benefit.

The Dixie Engine plan used a ten year/100% "cliff" vesting schedule under which the benefits an employee accrued with each year of service did not vest at all until he completed ten years of service, at which point they fully vested. *See* Article VII Paragraph 2; 26 U.S.C. § 411(a)(2)(A); 29 U.S.C. § 1053(a)(2)(A) (ERISA provisions sanctioning 10 year cliff vesting). Consequently, the accrued benefits of all Dixie Engine employees who had worked for Dixie Engine for less than ten years when the plan terminated are Category 6 benefits. Because Category 6 encompasses accrued benefits that were not vested immediately prior to termination, inclusion of unaccrued benefits based on anticipated future years of service in Category 6 is not necessary to

---

**29.** We note that to the extent allowing employers to recover surplus assets creates the abusive potential for using pension funds as a vehicle for tax-sheltered investments, it is a matter for Congress rather than the judiciary. Indeed, Congress' awareness of the potential abuses of the pension system is evident from the recent 10% excise tax it enacted on plan reversions of surplus assets.

**30.** The limitations on the benefits guaranteed by the PBGC are set forth at 29 U.S.C. § 1322 and 29 C.F.R. § 2613.

give meaning to that category, contrary to Blessitt's arguments.[31]

Blessitt's interpretation of the scope of Categories 5 and 6 does not comport with the terms of the Dixie Engine plan. Paragraph 6 of Article XI ("Plan Termination Procedures") of the plan specifies the order in which plan assets are distributed when the plan terminates. Assets first are distributed to benefits already in pay status at the termination date, then to all other benefits guaranteed by the PBGC. This distribution scheme echoes Categories 3 and 4 of the § 1344 allocation procedure.[32] Next, assets are distributed to "all other benefits which were nonforfeitable immediately prior to the date of termination...." Finally, assets are distributed to "all other benefits under this Plan which are not otherwise provided for under [the other allocation categories]." The priority which the plan affords to benefits vested before the termination date relative to benefits under the plan not otherwise provided for (i.e. accrued, non-vested benefits) is precisely the preference created by Categories 5 and 6.

Finally, placing accrued benefits that become nonforfeitable solely because of plan termination in Category 6 comports with common sense notions of equity and fairness. When a plan terminates and has insufficient assets to meet all its accrued benefit liabilities, the benefit claims of workers whose benefits were vested prior to plan termination logically *should* have priority over the benefit claims of workers whose accrued benefits were not vested. This desirable goal is accomplished by plac-

ing the two types of claims in separate categories: pre-termination *vested* (nonforfeitable) benefits in excess of the PBGC guaranteed amount go into Category 5; pre-termination *non-vested* (forfeitable) benefits go into Category 6. All Category 5 claims must be satisfied before distributions are made to Category 6 claims, thus granting priority to workers with vested benefits and preventing dilution of these accrued, vested benefits by the competing claims of employees with accrued, unvested benefits.

Blessitt's second argument is that the legislative history of the § 1344 allocation provisions supports his contention that Category 6 encompasses benefits based on future years of service. Blessitt argues that because the House version of ERISA used the category "other accrued benefits" while the final conference version used the category "other benefits under the plan", deletion of the term "accrued" from the final version indicates that Congress intended to include benefits other than accrued benefits. Assuming *arguendo* that a plausible interpretation of the change between the House bill and the Conference bill is that Congress intended to include benefits in addition to accrued benefits in Category 6[33] (e.g. ancillary benefits provided under the plan), we conclude that it is not plausible that Congress intended to include benefits based on anticipated future years of service.

Presumably the Conference bill represents a compromise position between the

---

**31.** We expressly do not address the question of whether the scope of Category 6 is limited to accrued benefits that were not vested when the plan terminated. We hold only that Category 6 does not encompass normal retirement benefits calculated on the basis of anticipated future years of service. Because we do not reach the issue of whether Category 6 includes ancillary benefits, early retirement benefits, or retirement-type subsidies, those cases which address this question are of limited use to us in our resolution of this appeal. *See Amato v. Western Union International Inc.,* 773 F.2d 1402 (2d Cir. 1985), *cert. denied,* 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986), and *Tilley v. Mead Corp.,* 815 F.2d 989 (4th Cir.1987). We note simply that neither *Amato* nor *Tilley* awarded early

retirement benefits based on future years of service. *See* discussion, *supra* Section II.C. We also note that with respect to plan years beginning in 1985, Congress amended ERISA to include early retirement benefits as accrued benefits. 29 U.S.C. § 1054(g); 26 U.S.C. § 411(d)(6). *See Bencivenga v. Western Pa. Teamsters,* 763 F.2d 574, 577 n. 3 (3d Cir.1985).

**32.** Because the plan did not provide for employee contributions, Categories 1 and 2 were inapplicable to the Dixie Engine plan and therefore not contained in the plan's allocation provisions.

**33.** We do not address this issue. *See* note 31.

House and Senate bills.[34] However, neither the House bill nor the Senate bill included benefits based on future years of service in the allocation scheme. To adopt Blessitt's position would mean that the conferees expanded the scope of the priority scheme far beyond that of either of the predecessor bills.

Our earlier discussion of the caselaw and regulatory interpretation has documented the fact that at the time Congress enacted ERISA, it was well established that retirement benefits were based on years of actual service. If Congress *had* intended to include benefits based on future years of service in Category 6, this would have constituted a major departure from pre-existing law and certainly would have merited detailed explanation. However, there is *no* mention in the legislative history that ERISA expanded the concept of benefits to which an employee was entitled to include benefits he possibly would earn in the future. Furthermore, it is clear from the introductory passages of the legislative history that the primary purpose of the House, Senate, and Conference reports was to fully explain any significant changes ERISA would bring to pension benefit law. All the other major ERISA changes affecting an employee's entitlement to benefits (e.g. vesting, funding standards, PBGC termination insurance) were exhaustively discussed. Thus, it seems extremely doubtful that Congress intended to introduce what amounts to a fundamental rethinking of the entire benefits area without *any* discussion or explanation. *See Drummond Coal Co. v. Watts*, 735 F.2d 469, 474 (11th Cir. 1984) (elimination of a single word between versions of a bill is an unreliable indicator of Congressional intent, particularly where the deletion is not explained).

## IV. CONCLUSION

In summary, the several relevant statutes, the regulations and administrative interpretations, the caselaw, and policy considerations all indicate that Blessitt's position is untenable. No authority suggests that ERISA requires the payment of retirement benefits based on future years of service not actually worked as of the date on which the Dixie Engine defined benefit plan terminated.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

**34.** The House Bill contained the following classes of priority:
(a) employee contributions
(b) vested benefits of employees already receiving benefits
(c) other vested benefits
(d) other accrued benefits
(e) interest on accrued benefits
(f) remaining liabilities proposed in the plan for payment upon termination
(g) pro-rata to each person entitled to receive a distribution on account of priorities (a) through (f)
The Senate Bill:
(a) voluntary employee contributions
(b) mandatory employee contributions
(c) benefits in pay status
(d) other insured benefits
*See* H.R.Conf.Rep. No. 1280, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 4639, 5154.