[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 28, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-12117

_____

D. C. Docket No. 04-00562-CV-PT-M

WENDELL F. GILLEY, an individual
and as class representative,

                                        Plaintiff-Appellee,

versus

MONSANTO COMPANY, INC., a corporation,
MONSANTO COMPANY SALARIED EMPLOYEES'
PENSION PLAN,
EMPLOYEE BENEFITS PLAN COMMITTEE,
PHARMACIA CORPORATION, a corporation,

                                        Defendants-Appellants,

MONSANTO COMPANY EMPLOYEE BENEFITS
EXECUTIVE COMMITTEE,

                                        Defendant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(June 28, 2007)**

Before CARNES, PRYOR and FARRIS,[*] Circuit Judges.

CARNES, Circuit Judge:

Throughout his judicial career Holmes relished challenging cases. While on Massachusetts' highest court he confessed to a friend that although none of the cases he had handled that year had been of universal interest, "there is always the pleasure of unraveling a difficulty."[1] A decade and a half later, while on the Supreme Court, he told the same friend that he had few cases of general interest that term, but "[t]here is always the fun of untying a knot and trying to do it in good compact form."[2] It is a pity that Holmes did not live to see ERISA cases.

## I.

Wendell Gilley was employed by Monsanto Company, Inc. from August 31, 1972 through February 16, 1982 at its Sand Mountain textile plant in Northeast Alabama. Monsanto closed the plant in March of 1981, but Gilley remained on the payroll in layoff status until February 1982 when he was finally let go.

---

[*] Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

[1] 1 Oliver Wendell Holmes, Jr., Feb. 23, 1890 Letter to Frederick Pollack, in The Holmes-Pollack Letters: The Correspondence of Mr. Justice Holmes and Sir Frederick Pollock 1874 – 1932 32, 33 (Mark DeWolfe, ed., Harvard Univ. Press 2d prtg. 1941).

[2] 1 Oliver Wendell Holmes, Jr., May 25, 1906 Letter to Frederick Pollack, in The Holmes-Pollack Letters, supra note 1, at 123, 124.

Although the period of his employment was under nine-and-a-half years, Gilley claims that with the overtime that he worked in 1972, he acquired the necessary ten years of "Vested Service" to merit pension benefits.

Under Monsanto's Salaried Employees' Pension Plan, certain employees are entitled to benefits if they are able to meet the vesting requirements of the plan. Although Monsanto has amended its pension plan several times over the years, all relevant versions of the plan set out the same basic vesting requirements: (1) an eligible employee must reach retirement age, and (2) the employee must acquire at least ten years of "Vested Service." An employee earns a year of Vested Service when he completes 1,000 "Hours of Service," defined as all hours of employment for which an employee is directly or indirectly compensated, during that year. The manner in which Hours of Service are calculated has varied as Monsanto has amended its pension plan.

When Gilley began work at Monsanto, the 1971 Plan was in effect. The pension plan was amended in 1976 to comply with the requirements of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, et seq., which went into effect, for our purposes, in 1976.[3] According to Monsanto, both

[3] The majority of ERISA became effective January 1, 1975, but for all pension plans in existence as of January 1, 1974, of which the Plan here was one, the participation and vesting standards of ERISA became applicable on the first day of the plan year beginning after December

3

the 1971 Plan and the 1976 post-amendment Plan utilized the "Elapsed Time Method" to calculate Vested Service for pension purposes. Under this method, an employee is credited with the hours that result from dividing the total number of calendar days of employment, including weekends and holidays, by 365 and then multiplying that number by 2,080 (the total hours in a "Standard Work Year" based on a forty-hour work week). In other words, an employee's Hours of Service are determined based on the fraction of the year he is employed, multiplied by the Standard Work Year—if an individual is employed for 176 days out of the year, he would be entitled to 1,002 Hours of Service or one year of Vested Service.

Sometime between 1979 and 1981, the Plan Committee decided to change the way Hours of Service are determined, adopting the "95-Hour Rule" and incorporating it into the amendments to the 1981 Plan. Under this calculation method, the provider credits all employees with ninety-five Hours of Service for each two-week period they are employed, regardless of the actual hours worked. The 95-Hour Rule expressly excludes additional credit for overtime hours, embodying the assumption that the fifteen extra Hours of Service credited on a bi-weekly basis (assuming a 40-hour week or 80 hours every two weeks) is a fair way

_____

31, 1975, effectively 1976. See 29 U.S.C. § 1061(b)(2).

to cover any overtime hours worked. In addition to adopting the 95-Hour Rule, the 1981 Plan stated that an employee's benefit rights are to be determined according to the pension plan in effect at the time that the employee separates from Monsanto.

Believing that he had acquired ten years of Vested Service, even though he had only worked for Monsanto for nine full years and part of two other years (1972 and 1982), Gilley applied for pension benefits in 2001. Monsanto denied his request, because it concluded that Gilley's Vested Service fell short of the requisite ten years. Gilley filed an administrative appeal, and the Monsanto Plan Committee denied his petition. It applied the 1981 Plan and the 95-Hour Rule to determine that Gilley was only entitled to 9.594 years of Vested Service.

Gilley filed suit claiming that Monsanto had: (1) arbitrarily and capriciously denied his claim for benefits, in violation of ERISA § 502, 29 U.S.C. § 1132; (2) made oral and written assurances that all employees hired at the Sand Mountain plant after September 1972 were vested and, therefore, is equitably estopped from denying Gilley benefits now under ERISA § 502; (3) intentionally closed the Sand Mountain Plant right before the employees would reach the ten-year mark, in violation of ERISA § 510, 29 U.S.C. § 1140; (4) amended the Plan to retroactively reduce or eliminate the amount of accrued Hours of Service in

5

violation of ERISA § 204(g)(1), 29 U.S.C. § 1054(g)(1); and (5) breached its fiduciary duty by failing to act in the best interest of plan participants, in violation of ERISA § 404, 29 U.S.C. § 1104.  Monsanto filed a motion to dismiss, arguing that the 1981 Plan governed the determination of Gilley's credit, and that under the plan Gilley lacked the requisite ten years of Vested Service.  The district court denied the motion to dismiss.

Gilley then filed an amended complaint, specifically restating all of his claims under the "equitable relief" section of ERISA, § 502(a)(3), 29 U.S.C. § 1132(a)(3), and adding a claim under § 502(c), 29 U.S.C. § 1132(c), and § 510, 29 U.S.C. § 1140, asserting that Monsanto had interfered with his attempts to attain benefits by refusing to provide him with requested documents.  The amended complaint alleged that the 95-Hour Rule should not be applied because, according to Gilley, it is less favorable to him than the 1976 Plan's method of calculating Hours of Service.

Monsanto filed a motion for summary judgment, asserting that ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), only permits equitable relief and does not apply when a party is seeking purely legal relief, as Monsanto claimed Gilley was

doing.[4]  Additionally, Monsanto restated its argument that Gilley cannot prove the

ten years of Vesting Service necessary to merit benefits.  It put before the court

Social Security records indicating that Gilley had earned a total of $2,149.68 in

1972, and other records showing that in 1972 his base salary had been $420

monthly, or $5,040 annually.  Gilley argued that the $420 figure actually included

overtime pay and that his monthly base salary was really only $390, which would

have been $4,680 annually.

Based on all of those records, Monsanto argued that even if the district court

calculated Hours of Service based on the actual hours Gilley worked, Gilley still

was not entitled to a pension.  Using the $2,149.68 figure, a $420 monthly base

salary, and the 2,080 hour "Standard Work Year" set out in the 1981 Plan,

Monsanto asserted that Gilley could have actually worked only 887.2 hours in

1972 (if all hours were compensated equally), well short of the 1,000 hours

---

[4] Monsanto contends that Gilley cannot properly make out an equitable claim under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), because he is actually seeking legal relief which can only be granted under § 502(a)(1)(b), 29 U.S.C. § 1132(a)(1)(b).  Our disposition of this appeal does not require us to decide the nature of the relief Gilley is seeking, and it is not a question that goes to the existence of subject matter jurisdiction.  See Blue Cross & Blue Shield of Ala. v. Sanders, 138 F.3d 1347, 1352 (11th Cir. 1998) (noting that subject matter jurisdiction exists even if the remedy sought under § 502(a)(3) is legal in nature, because a finding that the relief sought is legal in nature "'does not negate the existence of federal subject matter jurisdiction, but rather indicates that [the plaintiff] may have failed to state' a claim upon which relief can be granted" (quoting Health Cost Controls v. Skinner, 44 F.3d 535, 537–38 (7th Cir. 1995))).

needed.  Monsanto also pointed out that because the $2,149.68 salary Gilley earned in 1972 included compensation for some overtime and holiday hours, which would have been paid at a premium rate, Gilley's actual hours worked would be much less.  What's more, even if Gilley's claimed $390 monthly salary figure and the resulting $4,680 annual salary figure are accepted, the maximum it appears Gilley could have worked in 1973 based on the Social Security records is 955.41 hours (assuming all hours were compensated at the same hourly wage).  Still, the district court denied Monsanto's motion, finding that a trial was warranted based on the "closeness of the vesting issue."

A two-day bench trial was conducted solely to decide the number of Hours of Service credit Gilley was entitled to receive for his employment in 1972.  After trial, the district court ordered Gilley to submit an "itemized, succinct list showing exactly how [he] . . . would arrive at a minimum of 1,000 [H]ours of [S]ervice in 1972."  In response, Gilley offered three "equivalencies," claiming that each showed he was entitled to benefits.  ERISA gives a plan the option of using equivalencies in order to simplify the record keeping and calculation burdens associated with determining Hours of Service, 29 C.F.R. § 2530.200b-3(a).  A list of equivalencies from which a plan may choose is contained in the regulation, id. § 2530.200b-3(d), (e).

The district court accepted two of the three equivalencies that Gilley suggested. One of those two calculates Hours of Service based on "Hours Worked" under 29 C.F.R. § 2530.200b–3(d)(1), granting 1,000 Hours of Service if 870 hours are worked. The other calculates Hours of Service based on "Regular Time Hours" under 29 C.F.R. § 2530.200b–3(d)(2), granting 1,000 Hours of Service if 750 "Regular Time Hours" are worked. The parties dispute whether Gilley would be entitled to a pension under either or both of the two equivalencies the district court adopted. The math involved with both equivalencies is dense, enough so that during oral argument counsel had difficulty answering some of our questions about the numbers and formulas used during the trial.

The more fundamental point that Monsanto stressed, however, is that the Plan never included either of the two equivalencies that the district court used at Gilley's urging. Instead, the 1981 Plan included the 95-Hour Rule, another equivalency permitted by ERISA. See 29 C.F.R. § 2530.200b-3(e)(1)(iii). We will spare the reader the details of how the 95-Hour Rule plays out in Gilley's circumstances, except to say that everyone agrees that under it Gilley would not be entitled to a pension.

In its findings of fact and conclusions of law, the district court refused to apply the 95-Hour Rule set out in the 1981 Plan. Its reasoning was that "later

9

amendments to the Plan should not have an effect on the 1972 calculations if they impact adversely on plaintiff's entitlement."  Even though the two equivalencies that were more favorable to Gilley had never been part of the Plan, the district court justified their use on the grounds that Monsanto had not kept adequate records of the hours Gilley worked in 1972.  It said that Gilley was entitled to the "benefit of the doubt" because Monsanto had failed to keep adequate records from that year.  Applying the two equivalencies that Gilley preferred, the court determined that he did have the requisite Hours of Service to receive a full year of credit for 1972, giving him ten years of Vested Service which entitled him to a pension.  Throughout its reasoning, the court applied a "heightened arbitrary and capricious" standard of deference, because it concluded that the Plan Committee had a conflict of interest in making benefit decisions.

The court's judgment ordered Monsanto to pay Gilley his past due pension benefits, "plus appropriate interest," and to pay additional retirement benefits as they accrue in the future.  Monsanto filed a motion to alter or amend the district court's judgment, asserting multiple mathematical and legal errors in the application of the two equivalencies the district court used.  After the court denied that motion, Monsanto filed this appeal.

10

**II.**

We initially had some doubt about our jurisdiction to decide this appeal because, while the district court ordered Monsanto to pay "appropriate interest" on the award of past benefits, it did not specify the rate of interest or the date from which the interest would be calculated. We were concerned that the judgment might not be final under 28 U.S.C. § 1291 for purposes of appellate review.

The district court's failure to set an interest rate for calculating prejudgment interest might have been a problem for the purpose of our jurisdiction if the judgment had no injunctive aspects. See SEC v. Carrillo, 325 F.3d 1268, 1272–73 (11th Cir. 2003) (per curiam) (noting that "if the judgment amount, the prejudgment interest rate, or the date from which prejudgment interest accrues is unclear, the calculation of prejudgment interest is no longer a ministerial act and the court's order is not final"); but see Moon v. Am. Home Assurance Co., 888 F.2d 86, 89–90 (11th Cir. 1989) (addressing the merits but remanding the case back to the district court for clarification on the questions of whether prejudgment interest was intended and the rate at which any such interest should be calculated). However, the judgment here does include injunctive relief, because it requires Monsanto to continue to pay pension benefits as they accrue in the future. Under 28 U.S.C. § 1292(a)(1), we have jurisdiction over orders granting injunctive relief.

11

The district court's judgment here is injunctive enough in nature to give us jurisdiction over the appeal.

## III.

On the merits, both sides agree that Gilley must have ten years of credit to be entitled to a pension, and they agree that he earned at least nine years of credit for his work at the plant from 1973 to 1982. Their disagreement is about whether Gilley gets a full year of credit for 1972, his first year on the job, when he actually worked only four months for Monsanto. If Gilley is credited with a full year for working those four months, he gets a pension.

The district court's conclusion that Gilley should be treated as having worked a full year in 1972 was based on its belief that instead of the 95-Hour Rule in the 1981 Plan, the Hours Worked or Regular Time Hours equivalencies, which Gilley proposed, should be used. The parties disagree about whether Gilley is entitled to a pension even if those two equivalencies are used, but they do agree that he is not entitled to a pension under the 1981 Plan's 95-Hour Rule. The question that determines the issues we address in this appeal is whether the 95-Hour Rule is the equivalency that should be applied.

## A.

The parties think that the answer to that question might depend on the

12

standard of deference applicable to the Plan Committee's decision to deny Gilley pension benefits.  Monsanto argues that the arbitrary and capricious standard applies, while Gilley thinks the district court was correct to apply a heightened arbitrary and capricious standard.  Given the nature of the issue on which this case turns, we doubt that the standard of deference makes any difference.  To the extent that it does, however, the proper standard is arbitrary and capricious.

ERISA does not explicitly establish the standard of review to be applied to a plan administrator's decision.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109, 109 S. Ct. 948, 953 (1989).  Following the Supreme Court's direction, however, we have adopted three different standards to guide us:  (1) de novo review applies where the plan administrator has been given no discretion in deciding claims; (2) arbitrary and capricious review applies where the plan administrator has discretion in deciding claims and does not suffer from a conflict of interest; and (3) heightened arbitrary and capricious review applies where the plan administrator has discretion but suffers from a conflict of interest.  HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co., 240 F.3d 982, 993 (11th Cir. 2001).  For purposes of that third standard, a conflict of interest exists when a provider has to pay benefit claims out of its own assets, making it directly advantageous to the provider for the claims to be denied.  These three standards

13

have been broadly applied to both the administrator's interpretation of plan provisions as well as the administrator's decision to grant or deny benefits. Williams v. Bellsouth Telecomms., Inc., 373 F.3d 1132, 1135 n.3 (11th Cir. 2004); Paramore v. Delta Air Lines, Inc., 129 F.3d 1446, 1451 (11th Cir. 1997).

Our circuit law is clear that no conflict of interest exists where benefits are paid from a trust that is funded through periodic contributions so that the provider incurs no immediate expense as a result of paying benefits. See Buckley v. Metro. Life, 115 F.3d 936, 939–40 (11th Cir. 1997). Only when benefits are paid from a provider's assets, so that benefit decisions have a direct and immediate impact on the provider's profit margin, does the heightened standard come into play. See Williams, 373 F.3d at 1135.

In this case, the Plan gave the Plan Committee discretion to make benefits decisions. The record clearly establishes that benefits were paid out of a non-reversionary trust instead of from Monsanto's own assets. In Buckley, we specifically considered the standard of deference to be applied when benefits are paid out of a trust funded by periodic, non-reversionary contributions. 115 F.3d at 939. We held that where the company neither incurs a direct expense in paying benefits nor directly profits from denying or discontinuing benefits, there is no conflict of interest. Id. at 939–40. That holding has been reiterated in subsequent

14

cases.  See, e.g., Turner v. Delta Family-Care Disability & Survivorship Plan, 291

F.3d 1270, 1273 (11th Cir. 2002) (per curiam) (a non-reversionary, periodic trust

"eradicates any alleged conflict of interest so that the arbitrary or capricious

standard of review applies"). The fact that the company is responsible for

replenishing the funds of the trust is not enough to create a conflict of interest.  Id.

For these reasons, the district court erred in applying the heightened

arbitrary and capricious standard.  To the extent that a deference standard applies,

the ordinary arbitrary and capricious standard is the one.

**B.**

The district court also erred in forcing on the Plan two equivalencies that

the Plan had never adopted.  The court based its substitution of the equivalencies,

Gilley favored for the one in the Plan on its view that Monsanto had failed to keep

adequate records of the hours Gilley worked in 1972.  We have some doubts about

whether a court generally can impose on a plan equivalencies that the plan did not

choose simply because of the absence of adequate records.

We have no doubt, however, that a plan cannot be forced to use an

equivalency that is different from the one the plan chose simply because it or the

company did not keep adequate records for ERISA purposes before there was any

ERISA.  The year we are talking about is 1972, and ERISA was not enacted until

15

September of 1974 (with an effective date, for our purposes, of January 1, 1976,

see 29 U.S.C. § 1061(b)(2)).  Only after the time for doing so had passed did the

Plan and the company learn that it would be necessary to make and keep the

records.  Companies and pension plan managers are not required to be clairvoyant.

Instead, when it comes to pre-enactment years, ERISA requires only that

plans do the best they can with the records they have, and it permits plans to

choose an equivalency from those set out in the regulations. 29 C.F.R. §

2530.200b-3(b), (d), (e).  This is how the relevant regulation reads:

> If accessible records are insufficient to make an
> approximation of the number of pre-effective date hours
> of service for a particular employee . . . the plan may
> make a reasonable estimate of the hours of service
> completed by such employee . . . . A plan may use any of
> the equivalencies permitted under this section, or the
> elapsed time method of crediting service . . . to determine
> hours of service completed . . . .

Id. § 2530.200b–3(b).  That is exactly what the Plan did in this case.  It chose the

95-Hour Rule and applied the rule to the vagaries of Gilley's 1972 work history.

As the regulation we have quoted shows, ERISA permitted it to do so.  The statute

and regulations leave the choice of equivalencies to plans, not to courts.  The

district court should not have overridden the Plan's choice and applied an

equivalency that was not in the Plan.  See id. § 2530.200b–3(c)(1) ("Any

16

equivalency used by a plan must be set forth <u>in the document</u> under which the plan is maintained." (emphasis added)).

**C.**

In addition to substituting its own preferred equivalencies because of the lack of adequate records of Gilley's work hours in 1972, the district court also rejected the 95-Hour Rule because it was adopted after 1972. The record is unclear exactly when the 95-Hour Rule was adopted, but it was sometime between 1979 and January 1, 1981. The district court thought the fact that the rule was not adopted until sometime during that period foreclosed its use because, in the court's words, "later amendments to the Plan should not have an effect on the 1972 calculations if they impact adversely on plaintiff's entitlement."

First, it is important to recognize that there is no way Gilley could have accumulated the requisite ten years of Vested Service, under any calculation method, by the time Monsanto adopted the 95-Hour rule. On January 1, 1981, Gilley could have accumulated, at most, nine years of Vested Service credit. Even if he is given a full year of credit for 1972, he would still only have acquired nine years by the beginning of 1981. All of Gilley's arguments that he earned ten years of Vested Service count hours he worked in 1981 after the Plan was amended to put the 95-Hour Rule in place. This fact is critical to our analysis of whether the

17

adoption of the 95-Hour Rule and its application to Gilley violated ERISA.

Gilley takes the district court's determination that later amendments cannot adversely impact a plaintiff's entitlement and runs with it, casting it in terms of ERISA's "anti-cutback" rule. ERISA § 204(g), 29 U.S.C. § 1054(g)(1). One of the purposes of ERISA is to protect pension rights by ensuring "that if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it." Nachman Corp. v. Pension Benefit Guar. Corp., 446 U.S. 359, 375, 100 S. Ct. 1723, 1733 (1980). To further that purpose, the "anti-cutback" rule provides that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan." ERISA § 204(g), 29 U.S.C. § 1054(g)(1). By its own terms, what the rule forbids is cutbacks on "accrued benefits." There is a difference between "accrued benefits" and "vested benefits."

The Supreme Court has explained that benefit accrual is "the rate at which an employee earns benefits to put in his pension account," while benefit vesting refers to the point at which a participant's pension rights become nonforfeitable "by virtue of his having fulfilled age and length of service requirements." Central Laborers' Pension Fund v. Heinz, 541 U.S. 739, 749, 124 S. Ct. 2230, 2238 (2004). A participant is fully vested when he has a nonforfeitable right to his total

18

accrued benefit. In other words, benefit accrual affects the size of the pension, while benefit vesting determines whether a pension will be paid at all. See Stewart v. Nat'l Shopmen Pension Fund, 730 F.2d 1552, 1561–62 (D.C. Cir. 1984) (noting that "'vesting' governs when an employee has a right to a pension; 'accrued benefit' is used in calculating the amount of the benefit to which the employee is entitled"); Silvernail v. Ameritech Pension Plan, 439 F.3d 355, 359 (7th Cir. 2006) ("Benefit accrual and vesting are related but different concepts. 'Vesting provisions do not affect the amount of the accrued benefit, but rather govern whether all or a portion of the accrued benefit is nonforfeitable.'" (quoting Hoover v. Cumberland, Md., Area Teamsters Pension Fund, 756 F.2d 977, 983–84 (3d Cir. 1985))).

The Plan amendment adopting the 95-Hour Rule affected Gilley's ability to vest before he had vested, but it did not reduce the amount of his accrued benefit or the rate at which he was accruing benefits. Throughout Gilley's employment the Plan provided that an employee had to reach the retirement age and have accumulated the requisite ten years of Vested Service before he was entitled to a pension. The amendment adopting the 95-Hour Rule, which occurred during Gilley's employment, did not affect the rate at which he accrued benefits, although it did alter the method for calculating Vested Service, which in turn determined

whether he received a pension. The ERISA § 204(g) anti-cutback provision does not apply to changes in vesting requirements.

There is another provision, however, that does. Section 203 of ERISA provides that a plan amendment changing the vesting schedule shall be treated as not satisfying the requirements of ERISA:

> if the nonforfeitable percentage of the accrued benefit derived from employer contributions (determined as of the later of the date such amendment is adopted, or the date such amendment becomes effective) of any employee who is a participant in the plan is less than such nonforfeitable percentage computed under the plan without regard to such amendment,

unless the employee is given the option of electing the pre-amendment plan. ERISA § 203(4)(c)(1)(A); 29 U.S.C. § 1053(4)(c)(1)(A). Although Monsanto argues that the amendment introducing the 95-Hour Rule did not change the vesting schedule, some courts have concluded that changes in the way vesting is determined can amount to an alteration of the vesting schedule. See, e.g., Fentron Indus., Inc. v. Nat'l Shopmen Pension Fund, 674 F.2d 1300, 1306 (9th Cir. 1982) (noting that the cancellation of past service credits, which diminished the pension credits of otherwise vested participants, was a vesting schedule amendment). We will assume for present purposes that those courts are correct and that the Plan amendment we are discussing did change the Plan's vesting schedule.

20

Even making that assumption, there still was no violation of ERISA § 203, because the plain language of the provision limits its scope to benefits that are nonforfeitable ("if the nonforfeitable percentage . . . such nonforfeitable percentage") at the time the amendment is adopted or becomes effective ("determined as of the later of the date such amendment is adopted, or the date such amendment becomes effective"). ERISA § 203(4)(c)(1)(A); 29 U.S.C. § 1053(4)(c)(1)(A). When the 95-Hour Rule amendment became effective on or before January 1, 1981, and when it was adopted sometime on or before that date, Gilley was not entitled to any benefits, because he could not have earned ten years of Vested Service until after that date. Because Gilley was not vested at the time the amendment was adopted or became effective, ERISA § 203 does not help him. It follows that the district court erred in concluding that the Plan amendment adopting the 95-Hour Rule could not be applied to Gilley because it came after he had started earning credit toward his pension.

## D.

To the district court's reasons for not allowing the 95-Hour Rule, Gilley adds some more of his own. Among them is his assertion that he was never properly notified of the amendment. We decline to consider that contention because it was raised for the first time in this appeal. FDIC v. Verex Assurance,

21

Inc., 3 F.3d 391, 395 (11th Cir. 1993) ("By well settled convention, appellate courts generally will not consider an issue or theory that was not raised in the district court."). Gilley also appears to argue that the amendment discriminates against him, an argument which is difficult to follow and unpersuasive in any event.

Finally, Gilley raises a host of arguments, both before us now and in earlier proceedings, about why he is equitably entitled to a pension notwithstanding his inability to satisfy the vesting requirements under the 95-Hour Rule. The district court did not reach any of these arguments and we decline to take the first swing at them. Some may require factual development, while all of them may benefit from two-tier consideration. All of them the district court should deal with as it deems appropriate on remand.

## IV.

The judgment of the district court is **VACATED** and the case is **REMANDED** for further proceedings consistent with this opinion.