[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 23, 2012
JOHN LEY
CLERK

No. 10-14704
_____

D.C. Docket No. 1:09-cv-01739-JOF


JEAN MARIE CINOTTO,
on behalf of herself and all others similarly situated,

                                                          Plaintiff-Appellant,


versus


DELTA AIR LINES INC.,
THE ADMINISTRATIVE COMMITTEE,
THE ADMINISTRATIVE SUBCOMMITTEE OF DELTA AIR LINES, INC.,
LISA A. BROWN,
CHERIE CALDWELL, et al.,

                                                          Defendants-Appellees.


_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(March 23, 2012)

Before CARNES and HULL, Circuit Judges, and ROTHSTEIN,[*] District Judge.

HULL, Circuit Judge:

This appeal involves the anti-cutback rule in § 204(g) of the Employee Retirement Income Security Act of 1974 ("ERISA"), codified as 29 U.S.C. § 1054(g). Specifically, § 204(g)'s anti-cutback rule forbids, with a few exceptions, a pension plan amendment that decreases a participant's "accrued benefit." The particular pension plan here has always used a Social Security offset to reduce a participant's pension retirement benefits. The narrow question before us is whether this pension plan amendment violated the anti-cutback rule when it changed the calculation of that Social Security offset for participants who had not yet reached age 52, the plan's earliest retirement age, at the time of the amendment. We hold that it did not.

## I. BACKGROUND

Although the ERISA issue is complex, the relevant facts are undisputed. Plaintiff-Appellant Jean Marie Cinotto works as a flight attendant for Defendant-Appellee Delta Air Lines, Inc. In that capacity, Cinotto has worked for Delta for approximately thirty years, and still does. She is a participant in Delta's Family-

---

[*]Honorable Barbara Jacobs Rothstein, United States District Judge for the Western District of Washington, sitting by designation.

Care Retirement Plan ("the Plan"), which covers all employees except pilots. The Plan's calculation of a participant's retirement benefit factors in (1) years of service, (2) earnings at Delta, and (3) an offset for the amount of the participant's Social Security benefit. The earliest retirement age under the Plan is age 52.

On March 31, 2007, the Plan amended its calculation of the Social Security offset, and on that date, Cinotto had not yet attained age 52. The relevance of these undisputed facts is explained below.

## A.     The Delta Plan: Two Types of Defined Benefits

The Delta Plan is a "defined benefit" pension plan. The Plan provides two types of defined benefits: (1) "retirement" benefits under Article Five for employees who retire directly from Delta, and (2) "termination" or "deferred vested" (hereinafter "termination") benefits under Article Six for certain employees who terminate employment from Delta for any reason other than retirement or death.

As to the first type, a Plan participant is eligible to receive retirement benefits upon attaining age 52. A participant who retires between ages 52 and 65 takes "early retirement," while a participant who retires at or after age 65 takes "normal retirement." If a participant chooses to commence payment of his benefits between the ages of 52 and 65, his benefits are actuarially reduced. By

contrast, if a participant waits until age 65 to commence payment, he receives a larger benefit amount, or "normal retirement income benefit." The Plan also states that "a Participant's retirement income benefit under the Plan shall become non-forfeitable no later than the Participant's Normal Retirement Date."

As to the second type of defined benefit, a Plan participant is eligible to receive "termination" benefits upon (1) completing at least five years of continuous service or reaching age 52, and (2) then terminating employment for a reason other than retirement or death. A participant commences receiving termination benefits similarly to retirement benefits. That is, a participant receives a larger monthly benefit by waiting to draw benefits until age 65, but if he draws benefits between the ages of 52 and 65, his monthly benefit is actuarially reduced. The Plan also states that "if a Participant has a termination of employment" with Delta "(i) after attaining age 52 or (ii) after completing 5 years of continuous service, the Participant shall be 100% vested in his or her Accrued Benefit under this Plan."

In both types of defined benefits, the benefit amount is determined using a Social Security offset, as discussed later.

B.      **"Accrued" Benefits**

Because the anti-cutback rule applies only to an accrued benefit, we review

4

the Plan's definition of an accrued benefit.

In Article One, the Plan defines the term "Accrued Benefit." An "Accrued Benefit" under the Plan "as of any determination date shall be an annual benefit payable monthly (as determined [under the Plan]) commencing on the Participant's Normal Retirement Date, or on the Annuity Starting Date if later." As part of this definition of "Accrued Benefit," the Plan states: "No Participant shall have an Accrued Benefit based on future or projected service or Earnings regardless of the use of future dates by the Plan. Such future dates and the result of projected service on future Earnings on a Participant's potential retirement benefit are not part of the Participant's Accrued Benefit."

The Plan defines "Normal Retirement Date" as "the first day of the month coinciding with or next following the date he or she attains age 65." "Normal Retirement Date" is thus tied to being 65. By contrast, the "Annuity Starting Date" applies to a participant who takes early retirement, which is at or after age 52 but before age 65.[1] The "Annuity Starting Date" is defined as "[t]he first day of the first period for which a retirement benefit is paid as an annuity, or, in the case

---

[1]For that early-retirement participant, the Plan states that he "may elect as his . . . Annuity Starting Date (i) his . . . Early Retirement Date, or (ii) the first day of any month following his . . . Early Retirement Date up to the date specified in Section 10.13 [of the Plan]." "Early Retirement Date," in turn, "is the first day of any month on which the Employee retires from [Delta], provided that the Employee has attained age 52, but has not attained age 65, when the Employee so retires."

5

of a retirement benefit that is not paid in the form of an annuity, the first day on which all events have occurred which entitle the Participant to such benefit."

## D.      The Plan's Benefit Formula

In addition, a defined benefit pension plan generally provides a formula whereby a participant can determine what benefit, if any, is payable to him. The Delta Plan provides such a formula, using the same factors for both retirement and termination benefits. To determine a participant's benefit, three factors are used: (1) a participant's Final Average Earnings ("FAE");[2] (2) his Primary Social Security Benefit ("PSSB");[3] and (3) his months-of-credited-service-to-30-years ratio. The final average earnings benefit is the product of the credited-service ratio and the difference of 60% of the FAE less 50% of the PSSB. The full amount of this monthly benefit is payable to participants beginning at age 65; participants may begin receiving a reduced benefit as early as age 52.

The deduction of the PSSB is commonly referred to as the "Social Security

---

[2]A participant's FAE is his monthly average earnings, determined by dividing the highest sum of his earnings in any 36 consecutive calendar months by 36. For example, if a participant's highest sum of his earnings during any 36-month period is $117,000, then his FAE equals $3,250 ($117,000 ÷ 36).

[3]A participant's PSSB is the "monthly old age benefit" available "under the Federal Social Security Act . . . or under any successor Federal law determined as of the applicable date and in the manner set forth in [the Plan]."

6

offset."[4]  The Plan's formula for determining the Social Security offset is the center of this case's dispute.  Delta has amended the formula for the Social Security offset twice in recent years, in amendments known as Amendments Seven and Eight.  Only Amendment Eight is challenged here.  The next sections describe how the Social Security offset worked before and after each Amendment.

**E.      Social Security Offset Formula Prior to Amendment Seven**

Prior to Amendment Seven, the Plan's methods for determining a participant's PSSB—and thereby his Social Security offset—worked as follows. The Plan separated participants based on whether they had reached age 52 as of June 30, 2003.

For a participant age 52 or older on June 30, 2003, the Social Security offset was "determined by assuming the Participant had no income after June 30, 2003." This assumption of no future income meant no future Social Security contribution, which resulted in a smaller Social Security offset and a larger Plan benefit.  As discussed later, Amendments Seven and Eight to the Plan did not change the "no income" offset formula for participants age 52 or older on June 30, 2003.

---

[4]The Plan states that the Social Security offset "shall not reduce the Participant's [benefit] until the earlier of the Participant's Social Security Retirement Age or the date the Participant begins receiving social security benefits."  Thus, the Social Security offset does not apply until the employee is eligible to receive Social Security or begins to receive it.

7

However, if a participant had not reached age 52 by June 30, 2003, then the Plan (prior to Amendments Seven and Eight) determined the Social Security offset "based on [1] whether the Participant terminates employment with [Delta] before or after June 30, 2010 and [2] whether the Participant is eligible for a retirement income benefit . . . or a [termination] benefit." If that participant terminated employment before June 30, 2010, and was eligible for a retirement benefit, the Social Security offset was "determined by assuming the Participant had 2003 Level Pay . . . from July 1, 2003 to the date the Participant attains age 52." If instead that participant terminated employment before June 30, 2010, and was eligible for only a termination benefit, the Social Security offset was "determined by assuming the Participant had 2003 Level Pay until the Participant attained age 65."

If a participant terminated employment after June 30, 2010, the Plan provided that, regardless of whether the participant is eligible for a retirement or termination benefit, the Social Security offset was "determined by assuming the Participant had no income after the earlier of the date the Participant attains age 52 or June 30, 2010."

## F.    Amendment Seven, Effective December 31, 2005

On December 31, 2005, Amendment Seven to the Plan became effective.

The Amendment made two primary changes: (1) a freeze of benefit accruals, and (2) a modification of the Social Security offset for participants under age 52 on June 30, 2003.

By virtue of Amendment Seven, the amended Introduction to the Plan provided that "[e]ffective December 31, 2005, all benefits under the Plan are frozen for all Participants and there shall be no further accruals of benefits under this plan after that date." Amendment Seven also added this language to the end of the Plan's definition of "Accrued Benefit": "A Participant shall not accrue any additional benefits under the Plan after December 31, 2005." This meant that a participant's FAE period ended and would be calculated as of December 31, 2005, and his months of credited service ended as of December 31, 2005. Although a participant continued to work for Delta, no additional months of service or earnings would be taken into account in calculating either his retirement or termination benefit under the Plan.

The amended Social Security offset formula continued to separate participants based on whether they had attained age 52 on June 30, 2003. Amendment Seven, however, did away with the distinction between participants retiring before and after June 30, 2010. For a participant age 52 or older as of June 30, 2003, the Plan left intact the "no income" formula and provided that the

9

Social Security offset would be "determined by assuming the Participant had no income after June 30, 2003."

For a participant under age 52 as of June 30, 2003, the Plan provided that, effective December 31, 2005, the Social Security offset would depend on whether that participant later became eligible for (1) a retirement benefit under Article Five or (2) a termination benefit under Article Six. In other words, the amount of the Social Security offset hinged on whether a participant (1) continued to work at Delta, retired directly from Delta, and received a retirement benefit, or (2) terminated employment with Delta prior to retirement and received a termination benefit.

As to a retirement benefit, and if a participant had reached age 52 by December 31, 2005, his Social Security offset was determined by "assuming the Participant had 2003 Level Pay . . . from July 1, 2003 to the date the participant attains age 52 and no pay thereafter."

As to a retirement benefit, and if a participant had not attained age 52 by December 31, 2005, his Social Security offset was determined by "assuming . . . 2003 Level Pay from July 1, 2003 to December 31, 2005 and no pay thereafter." When Amendment Seven became effective on December 31, 2005, plaintiff Cinotto had not turned 52 and thus was not yet eligible for a retirement benefit.

10

Under Amendment Seven, if Cinotto continued to work at Delta and later became eligible for a retirement benefit, Cinotto's Social Security offset would have been calculated using her 2003 level pay from July 1, 2003, to December 31, 2005.

To calculate a termination benefit under Article Six, the Plan determined the Social Security offset "by assuming the Participant had 2003 Level Pay until the Participant attained age 65."

### G. Amendment Eight, Effective March 31, 2007

Two years later, Delta again amended the Plan, effective March 31, 2007. Amendment Eight modified who was eligible for the favorable Social Security offset, but left intact the benefit accrual freeze. At the time Amendment Eight went into effect, Cinotto was still under age 52 and still employed by Delta.

Amendment Eight continued to distinguish between participants age 52 and older and those under age 52. Amendment Eight grandfathered in participants who had already reached age 52 by its enactment date, maintaining the status quo that had existed for them under the Plan.

But for a participant, such as Cinotto, who had not reached age 52 as of March 31, 2007, Amendment Eight changed the rules. Regardless of whether a participant was eligible for a retirement benefit under Article Five or a termination benefit under Article Six, he would not receive the favorable Social Security

11

offset. Instead, the offset would be "determined by assuming the Participant had 2003 Level Pay until the Participant attains age 65."

In summary, Amendment Eight did not affect the Social Security offset calculation of (1) an employee who terminated employment prior to age 52 and thus received a termination benefit or (2) an employee who had already reached age 52 by March 31, 2007, and thus was eligible for a retirement benefit prior to Amendment Eight. Rather, Amendment Eight changed the calculation of the Social Security offset for only an employee who was under age 52 on March 31, 2007, (the effective date of Amendment Eight) and not yet eligible for a retirement benefit but who subsequently continued to work for Delta until age 52 and then became eligible for a retirement benefit. Amendment Eight eliminated the possibility that an under-age-52 participant could decrease his Social Security offset (and thereby increase his future retirement benefit) by continuing to work at Delta past age 52 and becoming eligible for a retirement benefit under Amendment Seven's more favorable offset formula (i.e., of 2003 level pay to December 31, 2005, and no pay thereafter).

As Delta explained in its notice of Amendment Eight's changes sent to participants: If a participant ultimately receives a termination benefit, the participant's benefit remains the same as it would have been under Amendment

12

Seven. However, if a participant ultimately receives a retirement benefit, the participant's benefit decreases from what it would have been under Amendment Seven.

## H. District Court Proceedings

In June 2009, Cinotto filed a proposed class action complaint against Delta, alleging, <u>inter</u> <u>alia</u>, that Amendment Eight violated ERISA's anti-cutback rule. Delta moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). The district court granted Delta's motion.[5]

In its thorough opinion, the district court concluded that Amendment Eight, on its face, does not violate ERISA's anti-cutback rule. The court reasoned that the amended Social Security offset calculation for a retirement benefit was a separate benefit that did not accrue until a participant reached age 52 and thus Cinotto, who was under age 52 at the time of Amendment Eight, did not have an "accrued benefit" affected by Amendment Eight. Further, the district court noted that the anti-cutback rule did not protect a "future benefit expectation" based on "potential future service."

Cinotto then brought this appeal.

---

[5]On appeal, Cinotto does not challenge the district court's rulings regarding her fiduciary duty, co-fiduciary duty, or notice claims. Thus, we discuss only her anti-cutback rule claim.

## II.  STANDARD OF REVIEW

We review <u>de novo</u> the district court's grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim, accepting the complaint's allegations as true and construing them in the light most favorable to the plaintiff.  <u>Harris v. United Auto. Ins. Grp., Inc.</u>, 579 F.3d 1227, 1230 (11th Cir. 2009).

## III.  DISCUSSION

### A.    ERISA's Anti-Cutback Rule

ERISA's anti-cutback rule limits a pension plan's ability to decrease a participant's accrued benefits.  The rule provides, with few exceptions, that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan."[6]  29 U.S.C. § 1054(g)(1)–(2).

Cinotto contends that Amendment Eight violated ERISA's anti-cutback rule because it decreased her accrued pension benefits by eliminating the more favorable Social Security offset for retirement benefits.  Delta responds that Amendment Eight did not violate the anti-cutback rule because the Amendment affected only future accruals for persons under age 52.  That is, Delta argues that a

---

[6]ERISA circuitously defines "accrued benefit" as an "accrued benefit determined under the [pension] plan and . . . expressed in the form of an annual benefit commencing at normal retirement age."  29 U.S.C. § 1002(23)(A).  Thus, ERISA looks to what is an accrued benefit determined under the Plan.  Accordingly, we focus on the Plan documents.

14

participant did not accrue the more favorable Social Security offset formula until reaching age 52, and Cinotto was under 52 and not even eligible for a retirement benefit when Amendment Eight became effective.  Before analyzing the merits of Cinotto's claim, we review the three most relevant decisions relied on by the parties.  These decisions help us discern what is an accrued benefit for purposes of the anti-cutback rule versus a future benefit accrual or a vesting requirement not subject to the rule.

**B.     Central Laborers' Pension Fund v. Heinz**

We start with the Supreme Court's decision in Central Laborers' Pension Fund v. Heinz, 541 U.S. 739, 124 S. Ct. 2230 (2004), because Cinotto relies so heavily on it.  In Heinz, the plaintiff, a retired construction worker, had been receiving benefits under a defined benefit "service only" pension plan administered by the defendant.  Id. at 741, 124 S. Ct. at 2234.  The pension plan contained the following condition: if a retired participant, receiving monthly payments under the service only pension, subsequently accepted "certain 'disqualifying employment,'" then his monthly payments would be suspended as long as he continued in that employment.  Id. at 742, 124 S. Ct. at 2234.

When the plaintiff retired, he took an employment position that was permitted under the terms of the plan's condition.  Id.  Two years later, however,

the plan amended the condition's terms by expanding the list of disqualifying employment to include the plaintiff's post-retirement position. Id. Accordingly, the defendant deemed the condition triggered and suspended the payment of the plaintiff's monthly benefits. Id. The plaintiff then sued, arguing that the amendment reduced the value of his accrued benefits and thereby violated ERISA's anti-cutback rule. Id. at 742-43, 124 S. Ct. at 2234-35.

In assessing the plaintiff's claim, the Supreme Court noted some general principles about benefit accrual. The Supreme Court defined benefit accrual as "the rate at which an employee earns benefits to put in his pension account."[7] Id. at 749, 124 S. Ct. at 2238. Distinguishing between an accrued benefit and a future benefit accrual, the Supreme Court made clear that a pension plan may be amended, "as long as the change goes to the terms of compensation for continued, future employment." Id. at 747, 124 S. Ct. at 2237. The Supreme Court also observed that the anti-cutback rule did not apply to a "vested" benefit, because "vesting" is essentially a point in time: that is, when an employee has an irrevocable right to his accrued benefit "by virtue of . . . fulfill[ing] age and length

---

[7]ERISA requires a plan's accrual formula to establish one of three rules governing minimum accrual rates. In brief, the rules are the "3 percent," the "133 and 1/3 percent," and the "fractional" methods. 29 U.S.C. § 1054(b)(1)(A)–(C). For all, "social security benefits and all other relevant factors used to compute benefits shall be treated as remaining constant as of the current year for all years after such current year." Id.

16

of service requirements."[8]  Id. at 749, 124 S. Ct. at 2238; see also 29 U.S.C.

§ 1002(19) (defining the term "nonforfeitable," which ERISA uses

interchangeably with "vested," as "a claim obtained by a participant . . . to that

part of an immediate or deferred benefit under a pension plan which arises from

the participant's service, which is unconditional, and which is legally enforceable

against the plan").

In Heinz, the Supreme Court concluded that the employment condition was

an "element[] of the benefit itself and [is] considered in valuing it at the moment it

accrues."  Id. at 746, 124 S. Ct. at 2236 (emphasis added).  That conclusion was

supported by Internal Revenue Service regulations[9] establishing that the anti-

cutback rule "flatly prohibits plans from attaching new conditions to benefits that

an employee has already earned."  Id. at 747, 124 S. Ct. at 2237.  Under the facts

of the case, the plaintiff had already retired and was receiving accrued benefits

when the plan's amendment subsequently expanded the terms of the original

condition (i.e., expanded the list of disallowed employment); therefore, the

amendment "shr[ank] the value of [the retiree's] pension rights" and violated the

---

[8]Although the anti-cutback rule does not address vested benefits, the Internal Revenue Code does restrict permissible amendments to vesting requirements.  See 26 U.S.C. § 411(a)(10).

[9]The Supreme Court stated that Internal Revenue Code provisions concerning the I.R.C. version of the anti-cutback rule apply with "equal force" to ERISA's anti-cutback rule.  Cent. Laborers' Pension Fund v. Heinz, 541 U.S. 739, 747, 124 S. Ct. 2230, 2237 (2004).

anti-cutback rule.[10]  Id. at 744, 124 S. Ct. at 2236.

Contrary to Cinotto's contention, Heinz does not help her because of the materially different situation faced by the Supreme Court in that case.  Unlike Cinotto, the plaintiff-employee had already retired and was receiving benefits, and the plan amendment in Heinz affected the employee's receipt of undeniably accrued benefits.  What the parties disagreed about in Heinz was whether the forbidden-employment condition, which affected the potential suspension of payment of a plaintiff's accrued benefits after his retirement, was part of those accrued benefits.

Heinz's reasoning is therefore directed toward a situation distinguishable from here, where no condition threatens to suspend current payment of accrued benefits.  Rather, the disputed amendment in this case altered how the Social Security offset for a potential retirement benefit would be calculated, but only for a participant not yet eligible for that retirement benefit.  The offset, however, had and has no effect on whether a participant's current receipt of benefits will be suspended by a participant's action.  Put another way, the offset is not a condition,

_____

[10]Four Justices concurred, observing that they did not read the Heinz opinion to "foreclose a reading" of ERISA permitting the Secretary of Labor or the Secretary of the Treasury to issue regulations approving plan amendments similar to the one found by the Supreme Court to be a violation of the anti-cutback rule.  541 U.S. at 751, 124 S. Ct. at 2239 (Breyer, J., concurring).

such as in <u>Heinz</u>, that places limitations on whether Cinotto may receive a benefit, or after receiving a benefit, whether its payment will be suspended. The Social Security offset is simply a "term[] of compensation for continued, future employment." <u>Id.</u> at 747, 124 S. Ct. at 2237. These differences wholly distinguish this case from <u>Heinz</u>.

**C.    <u>Gilley v. Monsanto Co.</u>**

The next case, <u>Gilley v. Monsanto Co.</u>, 490 F.3d 848 (11th Cir. 2007), does not assist Cinotto much either, as it concerns a vesting, rather than accrual, requirement. In <u>Gilley</u>, this Court considered the differences between accrued and vested benefits in addressing the plaintiff's claim that the defendant's amendment to its pension plan violated the anti-cutback rule. 490 F.3d at 858. The plaintiff had worked at one of the defendant's plants for almost nine-and-a-half years when the plant closed. <u>Id.</u> at 852. During that time, the plaintiff was enrolled in the defendant's pension plan, which had the following vesting requirements: "(1) an eligible employee must reach retirement age, and (2) the employee must acquire at least ten years of 'Vested Service.'" <u>Id.</u> A year of vested service equaled 1,000 hours of service completed during that year. <u>Id.</u> The plan provided a formula for calculating the hours of service. <u>Id.</u>

When the plaintiff's employment was terminated, a formula called the "95-

19

Hour Rule" was used to calculate the hours of service. Id. at 853. The 95-Hour Rule had not been in place when the plaintiff began employment, however. Id. The 95-Hour Rule did not credit hours of service based on actual hours worked, but credited employees with 95 hours of service every two weeks. Id. The 95-Hour Rule excluded additional credit for overtime hours, embodying the assumption that even with a 40-hour week, 15 extra hours credited on a bi-weekly basis was a fair way to account for any overtime hours worked. Id.

After the plaintiff was terminated, he applied for but was denied pension benefits under the plan. Id. The defendant denied the pension benefits because, under the 95-Hour Rule, the plaintiff had worked only 9.594 years and thus not acquired the necessary years of vested service. Id. The plaintiff then sued and won in the district court. Id. at 855. In response to the defendant's appeal, the plaintiff argued, inter alia, that the defendant's adoption of the 95-Hour Rule violated ERISA's anti-cutback rule because it was adopted after the plaintiff began employment. Id. at 858.

In Gilley, this Court reversed, reasoning that the 95-Hour Rule amendment "affected [the plaintiff's] ability to vest before he had vested, but it did not reduce the amount of his accrued benefit or the rate at which he was accruing benefits." Id. at 859. We explained that the anti-cutback rule, by its own terms, forbids only

20

cutbacks on accrued benefits, and "[t]here is a difference between 'accrued benefits' and 'vested benefits.'" Id. at 858. After discussing the difference between vesting and accrual, this Court noted that the 95-Hour Rule did not affect the amount of the plaintiff's pension but only whether he met the ten-year requirement for vesting. Id. Because the amendment did not change his accrued benefits, the anti-cutback rule was not applicable. Id.

**D.    Blessitt v. Retirement Plan for Employees of Dixie Engine Co.**

Although not an anti-cutback rule case, our decision in Blessitt v. Retirement Plan for Employees of Dixie Engine Co., 848 F.2d 1164 (11th Cir. 1988) (en banc), is informative because it discusses accrued benefits and how they differ from anticipated benefits based on future years of service. Like Heinz and Gilley, however, the case does not help Cinotto.

The plaintiffs in Blessitt were enrolled in the defendant's pension plan but had not reached normal retirement age and were not yet retirement-eligible when the plan terminated. Id. at 1165. Accordingly, the defendant calculated the plaintiffs' pension benefits under the plan's termination formula, rather than the more favorable retirement formula. Id. Reaching normal retirement age (65) was a "prerequisite for qualifying for [the retirement] benefits." Id. at 1169. The plaintiffs brought suit, claiming that their pension benefits should have been

21

calculated under the retirement formula and that the defendant's calculation violated ERISA's termination scheme, codified at 29 U.S.C. § 1344. Id. at 1166, 1168.

In Blessitt, this Court concluded that a pension plan participant is not entitled to a benefit "calculated on the basis of anticipated future years of service which have not actually been worked as of the termination date." Id. at 1165. In rejecting the plaintiffs' claims, this Court noted that ERISA's "essential purpose" is to ensure that employees received their accrued benefits, but not to give them "something for nothing." Id. at 1176. Due to the plan's termination, the plaintiffs would never be able to work the necessary years to vest in retirement benefits and were therefore eligible only for termination benefits. Id. at 1174-76. This Court cited multiple cases concluding "that benefit accruals cease when the plan terminates." Id. at 1173. Indeed, "[n]o case has ever held that, when a defined benefit plan terminates, an employer is required to pay an employee retirement benefits based on future years of service not yet worked." Id. at 1172; see also Aldridge v. Lily-Tulip, Inc. Salary Plan Benefits Comm., 40 F.3d 1202, 1211 (11th Cir. 1994) (holding that the anti-cutback rule applied to both amendments to the plan and termination of the plan, but also stating that "[a]lthough the amendments may have reduced accrued benefits with respect to pre-amendment

22

service, the termination of the Plan only eliminated future benefit accrual," and concluding termination did not violate the anti-cutback rule).

Before discussing Cinotto's arguments, we also review how pension plans may lawfully integrate pensions with Social Security benefits.

**E.     Pension Plan Integration with Social Security Benefits**

The Delta Plan benefit formula uses a Social Security offset to calculate a participant's pension benefit.  ERISA expressly permits this type of offset, under a calculation practice known as "integration."  See Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 514, 101 S. Ct. 1895, 1902 (1981).  Integration discounts or "offsets" a participant's pension benefit with certain types of non-plan benefits, such as Social Security.  29 U.S.C. § 1056(b) (allowing plan to decrease plan benefits as long as the participant is not receiving benefits under the plan and does not otherwise have nonforfeitable rights to benefits); see also 26 U.S.C. § 401(*l*)(3)(B) (providing permissible offset formulas); Holliday v. Xerox Corp., 732 F.2d 548, 551 (6th Cir. 1984) ("[ERISA] itself establishes that it is permissible for a pension plan to provide for the offset of social security benefits.").  Because an employer funds half of an employee's Social Security benefits, integration is viewed as appropriate, despite its reduction of pension benefits.  See 26 C.F.R. § 1.401-3(e)(2)(i)(C).

23

Indeed, Congress recognized that the integration of Social Security benefits would reduce a participant's ultimate pension benefit, but nonetheless permitted the practice. See Alessi, 451 U.S. at 515, 101 S. Ct. at 1902; see also 29 U.S.C. § 1056(b). A congressional report notes ERISA's codification of then-current integration practice, as follows:

> Protection is given to retired individuals and individuals who are separated from the service of the employer against reductions in private plan benefits when social security benefit levels increase. In general, under present integration procedures, social security benefits attributable to employer contributions are treated as though they were part of the private plan. As a result when the level of social security benefits increases, some integrated plans have reduced the amount of the retirement benefits that they provide for covered employees.
>
> Present law under administrative practice provides that qualified plans may not use increases in social security benefit levels to reduce the benefits that they pay where the employees concerned are retired and are already receiving integrated plan benefits. The bill codifies this treatment for retired persons. It also extends the prohibition against reducing plan benefits where social security benefit levels are increased to cases where the individuals concerned are separated from service prior to retirement and have deferred nonforfeitable rights to plan benefits. This provision is effective for increases in social security benefits which take place after the date of enactment or on the date of the first receipt of plan benefits or the date of separation from service (whichever is applicable) if that date is later.
>
> These changes do not affect the ability of plans to use the integration procedures to reduce the benefits that they pay to individuals who are currently covered when social security benefits are liberalized.

H.R. Rep. No. 93-807 (1974), reprinted in 1974 U.S.C.C.A.N. 4670, 4695-96.

24

Prior to 1986, a pension plan could use as much as 83.33% of a participant's Social Security benefit as an offset against his accrued pension benefit. Rev. Rul. 71-446, 1971-2 C.B. 187. However, in 1986 Congress passed the Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085 (codified as amended in scattered sections of 26 U.S.C.), which reduced the permissible offset percentage. Tax Reform Act, § 1111. Now, any offset must comply with the complex rules set forth in the Internal Revenue Code. 26 U.S.C. § 401(*l*)(3)(B). There is no claim here that Delta's Amendment violates these IRS or other rules. The only issue is whether it violates the anti-cutback rule.

## F. Amendment Eight Does Not Violate ERISA's Anti-Cutback Rule

With this background, we more easily assess whether Amendment Eight violates ERISA's anti-cutback rule. To this end, it is important first to demarcate what Amendment Eight could not do. Because of Amendment Seven's accrual freeze, Amendment Eight could not affect future benefit accruals resulting from pay and service increases. There were none after 2005. Further, Amendment Eight could not reduce Cinotto's accrued benefit. The statute expressly forbids it. 29 U.S.C. § 1054(g). Thus, the dispositive issue here is whether Cinotto's accrued benefit included the right to Amendment Seven's more favorable Social Security offset—i.e., was the more favorable offset a "benefit," and if so, had Cinotto

25

"accrued" it?

We need not answer the "benefit" inquiry because the answer to the "accrual" question alone resolves the case. Even assuming a lower Social Security offset is a benefit, we conclude that Cinotto had not accrued this benefit at the time Amendment Eight went into effect. While the Plan arguably gave a participant a right to a certain offset formula upon reaching age 52 and becoming entitled to a retirement benefit, that right was dependent upon future service. In the Plan's own definition of "Accrued Benefit," it states: "No Participant shall have an Accrued Benefit based on future or projected service or Earnings regardless of the use of future dates by the Plan." Both the day before and the day after Amendment Eight, the lower Social Security offset for a retirement benefit had not become part of Cinotto's accrued benefit because she was under age 52 and depended on future employment with Delta to become eligible for a retirement benefit. Under Amendment Seven, Cinotto expected that if she continued to work at Delta and retired from Delta after reaching age 52, the Plan would estimate her Social Security benefits by assuming "no pay" after December 31, 2005. That did not mean the retirement formula using that particular offset was part of her accrued benefit.

This becomes clear by examining when the offset would become an accrued

26

benefit. The key to identifying an accrued benefit at a specific point—here the March 31, 2007 date of Amendment Eight—is to calculate what benefit a participant—here Cinotto—would be entitled to under the Plan if the participant ceased employment at that time. If Cinotto had ceased employment on March 31, 2007, the effective date of Amendment Eight, she would not have been entitled to the Social Security offset for those age 52 or over—i.e., eligible for retirement benefits—because she was under age 52. As an under-age-52 participant, Cinotto's ability to obtain the retirement-age offset was entirely dependent on her providing future service to Delta at least until age 52. Thus, Cinotto had not yet accrued a right to the more favorable offset, and consequently, a more favorable end benefit. Rather, Cinotto had at most an expectation of a future accrual. Where the right to future benefit accruals are contingent on additional service, such future increases are not presently accrued benefits. Put another way, a plan may freely amend how benefits are accrued in the future (or even end their accrual) so long as the amendment "goes to the terms of compensation for continued, future employment." Heinz, 541 U.S. at 747, 124 S. Ct. at 2237.

Although not cited by the parties, our decision in Blank v. Bethlehem Steel Corp., 926 F.2d 1090 (11th Cir. 1991), supports our conclusion. In Blank, employees sued their ex-employer and its pension plan for a retirement benefit.

27

Id. at 1092. The plan allowed employees who met certain age and service requirements a special benefit if one of two conditions occurred: (1) the employees' continuous service was broken due to a layoff or disability; or (2) continuous service was not broken but the employees were "absent from work by reason of a layoff resulting from his election to be placed on layoff status as a result of a permanent shutdown of a plant, department or subdivision thereof." Id. The employees met the age and service requirements; however, neither of the two other conditions occurred at the moment the employees sought the benefit, based on the plan's terms. Id. Therefore, the district court granted summary judgment for the defendants "finding that the benefit was not accrued within the meaning of ERISA." Id. This Court held that the district court "correctly applied the relevant law" regarding the ERISA issue, and we "adopt[ed] its reasoning." Id. at 1093. In the same manner, in the present case, Cinotto did not meet the conditions for the preferential Social Security offset because she had not reached age 52 while employed with Delta, so that benefit was not accrued.

We also note in closing a separate section of ERISA, 29 U.S.C. § 1056(b), that, although not directly implicated by our conclusion, supports our conclusion too. That section states:

If (1) a participant or beneficiary is receiving benefits under a pension

28

plan, or (2) a participant is separated from the service and has non-forfeitable rights to benefits, a plan may not decrease benefits of such a participant by reason of any increase in the benefit levels payable under title II of the Social Security Act . . . if such increase takes place after September 2, 1974, or (if later) the earlier of the date of first entitlement of such benefits or the date of such separation.

29 U.S.C. § 1056(b). In that provision, Congress prohibited a decrease in a participant's pension benefit due to increased Social Security benefit levels, but only for a nonforfeitable pension benefit, or where the participant "is receiving [a] benefit[]." In contrast, here, Amendment Eight modified how a pre-retirement age participant's Social Security benefit would be estimated, but only for purposes of integration with a future, and as-yet forfeitable, retirement benefit.

Simply put, Amendment Eight does not come within the scope of ERISA's anti-cutback rule. The anti-cutback rule protects only an accrued benefit from being reduced by plan amendment. Cinotto had an expectation for how the Social Security offset would work if she continued to work until age 52 and then retired from Delta, but only that. The anti-cutback rule does not protect a mere expectation based on anticipated years of future employment. Accordingly, we affirm the district court's dismissal of Cinotto's claim under Federal Rule of Civil Procedure 12(b)(6).[11]

---

[11]We recognize that in its brief Delta asserts that it adopted Amendment Eight in response to the Pension Protection Act, Pub. L. No. 109-280, 120 Stat. 780, passed by Congress in 2006.

**AFFIRMED.**

---

Delta states that the Act, which was to assist financially distressed airlines, required it to freeze all benefit accruals to qualify for funding relief under the Act. Because we conclude that Cinotto does not prevail under the Plan documents, we need not address any issue raised by Delta's contentions regarding the Pension Protection Act.