[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-13270

Non-Argument Calendar

_____

ESTATE OF DR. JOHN ELLIS, JR.,
THE JDE TRUST BY MARK J. PODLIN,
Attorney at Law, P.C., as Executor and Trustee,

                                        Plaintiffs-Appellants,

*versus*

AMERICAN ADVISORS GROUP, INC.,
a California Corporation,
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.,
a Delaware Corporation,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 2:18-cv-00070-LGW-BWC

_____

Before WILSON, LUCK, and ANDERSON, Circuit Judges.

PER CURIAM:

John Ellis got a reverse mortgage from American Advisors Group, Inc.  When he died, his Estate sued American Advisors Group for state law violations.  The district court dismissed most of the counts for failure to state a claim, and later granted summary judgment on the remaining two counts to American Advisors Group.  The Estate appeals.  We affirm.

## FACTUAL BACKGROUND

From 1995 until his death twenty years later, Ellis owned a house on Saint Simons Island, Georgia.  On October 1, 2014, he took out a reverse mortgage on the house, signing a security deed for the loan.  Paragraph 10 of the security deed provided:  "[the l]ender may require immediate payment in full of all sums secured by [the deed] if a [b]orrower dies and the [p]roperty is not the [p]rincipal [r]esidence of at least one surviving [b]orrower."  The deed also provided:  "[i]f [the l]ender requires immediate payment-in-full under [p]aragraph 10, [the l]ender may invoke the power of sale granted by [the b]orrower and any other remedies permitted

by applicable law." At the time of the loan, the house was appraised at $1,160,000.00.

Ellis died on June 26, 2015. "[A]bout a week" later, the Estate called American Advisors Group and said that Ellis had died. An unidentified woman who "was the person to talk to about" the subject told the Estate: "just let us know formally within the first six months after the date of [Ellis's] death that he's died, and provided you are actively marketing the property for sale, we'll give you two more [ninety]-day periods to sell it so that you'll have one year from the date of his death to sell the property before we would begin to initiate the process of starting a foreclosure."

In November 2015, the Estate received an "annual occupancy request form." The form asked whether Ellis was still occupying the house, because his occupancy was a condition of the reverse mortgage. On December 1, 2015, the Estate put the house up for sale for $1,499,000.00. Nine days later, the Estate sent a letter to American Advisors Group letting it know that Ellis had died. This letter also said that Ellis's personal property had been sold, the house had been marketed for sale, taxes and insurance for the house had been paid for the next year, the house's interior and exterior had been repainted in full, all the carpeting had been replaced, and the roof was being repaired. The same day, the Estate spoke with a representative of American Advisors Group over the telephone. The representative, a "Tamika," said that given the notice of Ellis's death, the Estate "would be given two additional three[-]month periods up until one year following the death." In

follow-up phone calls, other unidentified representatives of American Advisors Group confirmed that the Estate "would have until one year after the death" to sell the house before American Advisors Group would begin foreclosure.

On December 11, 2015, the Estate sent American Advisors Group another letter (addressed to Tamika), along with Ellis's death certificate and related legal papers. This letter mentioned the call with Tamika, the sale of Ellis's personal property, the repainting of the house, the recarpeting of all carpeted rooms, the sanding and refinishing of the wood floor, and ongoing roof repairs and landscaping improvements. The letter concluded: "[w]e expect [Ellis's] house to sell quickly because [it] is located approximately [one hundred] yards from the St. Simons Island beach, and is now, because of our recently completed work on it, in excellent new-looking condition, and has a magnificent roof deck the entire length of the house which provides excellent views of the beach and nearby Jekyll Island across the ocean."

On December 22, 2015, American Advisors Group sent to the Estate, through certified mail, a letter entitled "Mortgage Due [and] Payable Notification." This letter stated that "[t]he reverse mortgage . . . [wa]s technically in default due to the death of the borrower," and "[i]f the debt [wa]s not paid-in-full, or the property [wa]s not sold within [thirty] days," American Advisors Group was "required to initiate foreclosure proceedings." Even after the filing of the foreclosure action, said the letter, the Estate could "still pay all monies due" to stop it. The Estate never received the letter.

21-13270                Opinion of the Court                5

American Advisors Group got an extension from the United States Department of Housing and Urban Development (which regulates reverse mortgages) such that the Estate had until March 9, 2016 to sell the house. In exchange for the extension, the Estate had to provide monthly updates about its efforts to market and sell the house. According to American Advisors Group's notes for Ellis's loan account, representatives told the Estate on December 10 and 15, 2015 that American Advisors Group needed monthly updates. But the Estate denied ever being told to provide monthly updates. On January 4, 2016, the Estate provided an update. Between then and the end of the extension period on March 9, the Estate didn't provide any other updates.

After March 9, 2016, American Advisors Group began proceedings to foreclose on the house. In a letter dated March 11, it told the Estate that it was seeking to foreclose. On March 13, the Estate lowered the listing price from $1,499,000.00 to $1,179,000.00 "to sell [the house] quickly." On March 19, a local newspaper published a foreclosure notice for the house stating that American Advisors Group was the holder of the security deed and that the debt secured by the deed was "due because of . . . failure to pay the indebtedness as and when due and in the manner provided in the [n]ote and [s]ecurity [d]eed." After receiving the March 11 letter, the Estate asked for—and received—more time to sell the house.

On April 2, 2016, the Estate received its first written offer on the house. The offer was for $1,000,000.00. The buyers acknowledged that the Estate "recently lowered the price" (to

$1,179,000.00), but explained that they felt "comfortable with" their offer ($179,000.00 less than that) because the house required "extensive updates." After negotiations, the buyers bought the house for $1,145,000.00 on June 10, 2016. The Estate paid the reverse mortgage debt in full on June 22, and American Advisors Group released the lien on the house and ended the foreclosure process.

Shortly after the foreclosure process stopped, representative Brandi O'Bryant from American Advisors Group called the Estate to confirm receipt in December 2015 of the notifications about Ellis's death and the marketing of the house for sale and to apologize for mistakenly initiating foreclosure. She said: "I'm sorry. We just screwed up. We made a mistake. It's our fault. There was no default. You did everything you were supposed to do. The department that received your letter in December was partying over Christmas and with all the Christmas partying and festivities, they just never got the message to the foreclosure department that they had received the letter from you and that we shouldn't start foreclosure." The Estate told Ms. O'Bryant that the improper foreclosure had hurt it because real estate agents wouldn't show a house in foreclosure and they advised their clients to "wait until after foreclosure" to "buy [the house] for a bargain price."

## PROCEDURAL HISTORY

The Estate brought nine counts against American Advisors Group, five of which are on appeal: (one) promissory estoppel; (two) wrongful attempted foreclosure; (three) negligence (because

American Advisors Group didn't tell its foreclosure department not to foreclose on the house); (four) negligence (in commencing wrongful attempted foreclosure); and (seven) elder abuse in breach of a private duty.[1] American Advisors Group moved to dismiss for failure to state a claim. The district court granted the motion in part, dismissing all counts except one and two for promissory estoppel and wrongful attempted foreclosure.

The district court dismissed counts three and four—for negligence—because the alleged negligence arose from a contract without an independent duty in tort, and it dismissed count eight because the count made liability arguments without stating a cause of action. Count seven failed, the district court explained, because American Advisors Group's purported misconduct wasn't elder abuse under the Disabled Adults and Elder Persons Protection Act, O.C.G.A. section 30-5-1 et seq., and because the statute that supposedly allowed the Estate to bring a claim under the Act, O.C.G.A. section 51-1-8, didn't create an independent cause of action.

After taking discovery, American Advisors Group moved for summary judgment on counts one and two. The district court granted the motion. As to count one, the district court explained that it was unreasonable for the Estate to rely on unwritten promises by unidentified representatives about possible extensions for

_____

[1] The Estate does not appeal the dismissal of its other counts, so we don't address them in our discussion.

paying off the reverse mortgage.  Count two failed, said the district court, because the record didn't support that American Advisors Group knowingly published untrue information about the reverse mortgage.

## STANDARD OF REVIEW

We review de novo a dismissal for failure to state a claim. *Cinotto v. Delta Air Lines, Inc.*, 674 F.3d 1285, 1291 (11th Cir. 2012).  We accept the well-pleaded factual allegations as true and construe them in the light most favorable to the plaintiff.  *Id.*  To avoid dismissal, "a complaint must plead enough facts to state a claim to relief that is plausible on its face." *Cavalieri v. Avior Airlines C.A.*, 25 F.4th 843, 847–48 (11th Cir. 2022) (cleaned up).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 848 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

We also review de novo a grant of summary judgment. *Ginsburg v. United States*, 17 F.4th 78, 83 (11th Cir. 2021).  We "view[] the facts and draw[] all reasonable inferences in the light most favorable to the non-moving party." *Id.*  "Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." *Id.*

## DISCUSSION

We address the counts dismissed for failure to state a claim—negligence and elder abuse—before turning to the counts on which summary judgment was granted—promissory estoppel and wrongful attempted foreclosure.

### Negligence

The Estate contends that the district court erred in dismissing its negligence counts because American Advisors Group "had a duty—whether that duty was created by virtue of a contractual duty created by (a) [f]ederal [s]tatute, (b) the doctrine of promissory estoppel, or (c) by a duty of care under tort law"—and "clearly breached its duty." American Advisors Group representatives, the Estate says, "had a legal duty to notify their own foreclosure department to halt any wrongful foreclosure not authorized by [r]everse [m]ortgage [s]tatutes and [r]egulations." And, argues the Estate, American Advisors Group "breached its contractual duty under [r]everse [m]ortgage [r]egulations when it falsely reported in the Brunswick News to the public that the borrower was in default, when it was not," and "was negligent in not properly verifying and confirming that it was legally appropriate . . . to begin such a serious act as the foreclosure of a [s]ecurity [d]eed."

The general rule[2] in Georgia is that "a contracting party who suffers purely economic losses must seek his remedy in contract and not in tort." *GE v. Lowe's Home Ctrs., Inc.*, 608 S.E.2d 636, 637 (Ga. 2005). "The four elements of a tort cause of action" like negligence "are a duty, a breach of that duty, causation, and damages." *Wallace v. State Farm Fire & Cas. Co.*, 539 S.E.2d 509, 512 n.7 (Ga. Ct. App. 2000) (cleaned up). "A defendant's mere negligent performance of a contractual duty does not create a tort cause of action"; the plaintiff may sue in tort only if the defendant also breached a duty independent of the contract. *Id.* at 512. *Cf. Flintkote Co. v. Dravo Corp.*, 678 F.2d 942, 948 (11th Cir. 1982) ("The economic loss rule prevents recovery in tort when a defective product has resulted in the loss of the value or use of the thing sold, or the cost of repairing it. Under such circumstances, the duty breached is generally a contractual one and the plaintiff is merely suing for the benefit of his bargain.").

The security deed was a contract. *See Wilson v. Mountain Valley Cmty. Bank*, 759 S.E.2d 921, 924 (Ga. Ct. App. 2014) ("A security deed which includes a power of sale is a contract and its provisions are controlling as to the rights of the parties thereto and their privies." (alteration adopted)). Thus, Ellis (represented by the Estate) and American Advisors Group were contracting parties. And when the Estate brought its promissory estoppel count, it sued in contract. *See Pepsi Cola Bottling Co. v. First Nat'l Bank*, 281

---

[2] The Estate doesn't argue that an exception to the general rule applies.

S.E.2d 579, 581 (Ga. 1981) ("The main purpose of contract law is the realization of reasonable expectations induced by promises. This court has previously held that [a] party may enter into a contract invalid and unenforceable, and by reason of the covenants therein contained and promises made in connection with the same, wrongfully cause the opposite party to forego a valuable legal right to his detriment, and in this manner by his conduct waive the right to repudiate the contract and become estopped to deny the opposite party any benefits that may accrue to him under the terms of the agreement." (quotations omitted)).

In the amended complaint, the Estate took the first listing price ($1,499,000.00) as showing the house's fair market value, subtracted the selling price ($1,145,000.00), and came up with actual damages of $354,000.00. Then, the Estate alleged that American Advisors Group caused these damages—and only these damages—when it breached its contract with (or broke its promises to) the Estate, wrongfully attempted to foreclose on the house by publishing that Ellis was in default when he wasn't, negligently failed to notify its foreclosure department not to foreclose on the house, negligently breached its "duty not to speak or write untruthfully" about Ellis's financial condition, and "intentionally or negligently breached [its] private duty to not advertise that it was beginning foreclosure on the [house] when there was no default under the [s]ecurity [d]eed."

The Estate claimed that American Advisors Group improperly performed on its contractual duties when it broke its

representatives' promises not to foreclose on the house until a year after Ellis's death. And it calculated the value of its contracted-for benefit through the diminution in value of the house. It sued under both contract and negligence theories to recover these damages. But Georgia law limited it to contract claims. *See GE*, 608 S.E.2d at 637.

The Estate's arguments on appeal show that the contract and negligence counts sought the same relief. The arguments also imply that it doesn't matter where American Advisors Group's duty came from, only that it had a duty, breached it, and caused the Estate damages. But under Georgia law, it does matter where the duty came from, because it matters whether the duty arose independently of the parties' contractual arrangements. *See Wallace*, 539 S.E.2d at 512. Because American Advisors Group allegedly breached a duty in contract, the Estate cannot also sue in negligence for the damages caused by that breach. Thus, the district court didn't err in dismissing the negligence counts.

## Elder Abuse

The Estate asserts that the district court erred in dismissing its elder abuse count because O.C.G.A. section 51-1-8 allowed private duties to arise from statute and the Disabled Adults and Elder Persons Protection Act created a private duty not to abuse the elderly. The Estate also implies that American Advisors Group's "repeated[] reassur[ances] . . . that the borrowing process [wa]s safe and . . . specifically approved by the [f]ederal [g]overnment" created "a special relationship" between the parties and "impos[ed]

the special private duty to not abuse [Ellis] through reckless disregard and mistake in starting the wrongful foreclosure on [his house] after his death."

Section 51-1-8 provides that "[p]rivate duties may arise from statute or from relations created by contract, express or implied," and that "[t]he violation of a private duty, accompanied by damage, shall give a right of action." O.C.G.A. § 51-1-8. But the Georgia Supreme Court has interpreted this statute as "merely set[ting] forth general principles of tort law." *Reilly v. Alcan Aluminum Corp.*, 528 S.E.2d 238, 240 (Ga. 2000); *accord Reilly v. Alcan Aluminum Corp.*, 221 F.3d 1170, 1171 (11th Cir. 2000) ("The court reviewed the language of [sections] 51-1-8 and 51-1-6 and found that the statutes . . . merely set out general principles of tort law."); *Wells Fargo Bank, N.A. v. Jenkins*, 744 S.E.2d 686, 688 (Ga. 2013) ("A duty in this case cannot rest solely upon [section] 51-1-6 because this statute sets forth merely general principles of tort law.").

The Disabled Adults and Elder Persons Protection Act aims "to provide protective services for abused, neglected, or exploited disabled adults and elder persons," O.C.G.A. § 30-5-2, and to that end requires certain persons to report a need for protective services, *id.* § 30-5-4, and criminalizes the failure to report, *id.* § 30-5-8. The Act also defines "[a]buse" as "the willful infliction of physical pain, physical injury, sexual abuse, mental anguish, unreasonable confinement, or the willful deprivation of essential services to a disabled adult or elder person." *Id.* § 30-5-3(1).

The Estate alleged that the improper early foreclosure on the house amounted to elder abuse under the Act. The Estate attempted to use section 51-1-8 to create a cause of action under the Act. American Advisors Group, the Estate claimed, "had a duty to not abuse" Ellis or the Estate and breached that duty when it "negligently or intentionally wrongfully attempt[ed] the foreclosure of the [r]everse [m]ortgage."

For two independently sufficient reasons, the district court didn't err in dismissing the elder abuse count. First, the foreclosure didn't amount to elder abuse under the Act. It did not involve "the willful infliction of physical pain, physical injury, sexual abuse, mental anguish, unreasonable confinement, or the willful deprivation of essential services" to Ellis or the Estate. *Id.* And second, section 51-1-8 cannot be used to create causes of action. *See Reilly*, 528 S.E.2d at 240.

## Promissory Estoppel

The Estate argues that the district court erred in granting summary judgment to American Advisors Group on the promissory estoppel count because "it was entirely reasonable . . . to rely upon" American Advisors Group employees' unwritten confirmations of Federal Housing Administration and Housing and Urban Development policies "without a separate written confirmation." The Estate's reliance was reasonable, it says, given the federal regulatory scheme for reverse mortgages.

To prove promissory estoppel under Georgia law, a plaintiff must show: "(1) the defendant made certain promises, (2) the defendant should have expected that the plaintiffs would rely on such promises, and (3) the plaintiffs did in fact rely on such promises to their detriment." *Adkins v. Cagle Foods JV, L.L.C.*, 411 F.3d 1320, 1326 (11th Cir. 2005). The promises must concern "past or present facts," not the future. *Id.*; *accord Reuben v. First Nat'l Bank*, 247 S.E.2d 504, 507 (Ga. Ct. App. 1978) ("[E]stoppel applies to representations of past or present facts and not to promises concerning the future . . . ."). Although the statute of frauds requires that "[a]ny contract for sale of lands, or any interest in, or concerning lands" "must be in writing" to be binding, O.C.G.A. § 13-5-30(a)(4), "promissory estoppel allows enforcement of promises that would otherwise be defeated by the statute of frauds." *Johnson v. Univ. Health Servs.*, 161 F.3d 1334, 1340 (11th Cir. 1998). But "[p]romises that do not conform to the statute of frauds . . . will often be equally unenforceable under a promissory estoppel theory" because "[p]romissory estoppel requires that reliance on the promise be reasonable" and "[i]t usually is unreasonable to rely on a substantial promise that has not been reduced to writing." *Id.* (citing *R.T. Patterson Funeral Home v. Head*, 451 S.E.2d 812, 817 (Ga. Ct. App. 1994), for "the general rule that there is no justifiable reliance upon future promises which must be in writing to be enforceable").

A week after Ellis's death, when the Estate called American Advisors Group to let it know informally about the death, an unidentified representative said: "let us know formally within the first

six months after the date of [Ellis's] death that he's died, and provided you are actively marketing the property for sale, we'll give you two more [ninety]-day periods to sell it so that you'll have one year from the date of his death to sell the property before we would begin to initiate the process of starting a foreclosure." About five months later, a woman known only as "Tamika" said that the Estate "would be given two additional three[-]month periods up until one year following [Ellis's] death." And other unidentified representatives later confirmed that the Estate "would have until one year after the death" to sell the house before foreclosure.

These promises looked forward to a time when the Estate would give formal notice, and used the future tense to discuss conditional extensions. Because they concerned the future and not "past or present facts," promissory estoppel didn't apply to them. *See Adkins*, 411 F.3d at 1326. Even if it did, because these unwritten promises from unidentified employees were "for sale of lands, or any interest in, or concerning lands," O.C.G.A. § 13-5-30(a)(4), they didn't "conform to the statute of frauds," and it was "unreasonable" for the Estate "to rely on" them when they were "substantial" and "ha[d] not been reduced to writing." *Johnson*, 161 F.3d at 1340. Thus, the district court didn't err in granting summary judgment to American Advisors Group on the promissory estoppel count.

### Wrongful Attempted Foreclosure

Lastly, the Estate appeals the district court's summary judgment to American Advisors Group on the wrongful attempted

21-13270          Opinion of the Court                    17

foreclosure count, contending that the attempted foreclosure was wrongful because the foreclosure notice in the local newspaper "falsely stated" that Ellis was in default when, "according to the [r]everse [m]ortgage [r]egulations," he wasn't. In the Estate's view, federal regulations—not the security deed—"control[led] when the indebtedness [wa]s due," and these regulations provided that "the indebtedness [wa]s not *actually* due until one year after the death of the borrower, provided the house [wa]s being marketed for sale."

"Under Georgia law, to recover damages for a wrongful attempted foreclosure, the plaintiff must prove a knowing and intentional publication of untrue and derogatory information concerning the debtor's financial condition, and that damages were sustained as a direct result of this publication." *Bates v. JPMorgan Chase Bank, NA*, 768 F.3d 1126, 1134 (11th Cir. 2014) (cleaned up). "Where the debt is secured by a security deed and note giving the creditor the right and power to advertise and sell the security for the payment of the balance due on the debt upon default of the debtor, the creditor commits no libel or tortious act by exercising the right granted in contract." *Aetna Fin. Co. v. Culpepper*, 320 S.E.2d 228, 231–32 (Ga. Ct. App. 1984) (cleaned up); *accord Wilson*, 759 S.E.2d at 924 ("In exercising a power of sale, the foreclosing party is required only to advertise and sell the property in accordance with the terms of the instrument and to conduct the sale in good faith.").

The foreclosure notice made clear that it based its information about Ellis's financial condition on the terms of the security deed. It stated that "[t]he debt secured by [the] [s]ecurity [d]eed ha[d] been and [wa]s . . . declared due because of . . . failure to pay the indebtedness as and when due and in the manner provided in the [n]ote and [s]ecurity [d]eed." The security deed gave American Advisors Group the right to "require immediate payment in full" if Ellis died and there were no surviving borrowers, and it allowed American Advisors Group, in exercising this right, to "invoke the power of sale granted by [Ellis] and any other remedies permitted by applicable law." Ellis died and left no surviving borrowers, so under the security deed, American Advisors Group could require immediate payment in full and could foreclose on the house to get it. The published information was thus not "untrue." *See Bates*, 768 F.3d at 1134. The Estate was in default under the security deed.

The only evidence that the Estate wasn't in default under the security deed was Ms. O'Bryant's statement that "[t]here was no default." Setting aside whether she was qualified to give this opinion, Ms. O'Bryant's statements do not support "a knowing and intentional publication of untrue and derogatory information." *See id.* They establish that American Advisors Group's publication of any untrue information was not "knowing and intentional" but merely mistaken—the result of interdepartmental miscommunication caused by "Christmas partying." Because the evidence didn't support "a knowing and intentional publication of untrue and derogatory information concerning [Ellis]'s financial condition," *see*

*id.*, the district court didn't err in granting summary judgment to American Advisors Group on the wrongful attempted foreclosure count.

## CONCLUSION

The district court properly dismissed the negligence and elder abuse counts for failure to state a claim. And it properly granted summary judgment to American Advisors Group on the promissory estoppel and wrongful attempted foreclosure counts. Thus, we affirm.

**AFFIRMED.**